JAMES S. POOR *et al.*, Plaintiffs-Appellees, *v.* DI MUCCI HOME BUILDERS, INC., Defendant-Appellant.

Second District    No. 81-239

Opinion filed February 3, 1982.—Rehearing denied March 10, 1982.

John N. Pieper, Aldo E. Botti, and Marcia N. Johnson, all of Botti, Marinaccio & Wilkinson, Ltd., of Wheaton, and Daniel Mangiamele, of Chicago, for appellant.

Wayne B. Flanigan, of Wasneski, Kuseski, Flanigan & Dixon, of Waukegan, for appellees.

JUSTICE UNVERZAGT delivered the opinion of the court:

This is an appeal from the judgment of the circuit court of Lake County awarding damages against Di Mucci Home Builders, Inc., which constructed dwellings for the plaintiffs Poor and Fent on lots they purchased from the defendant.

James and Marjorie Poor purchased Lot 24 from the defendant, and Richard and Betty Lou Fent purchased Lot 25 from the defendant, in a subdivision developed by the defendant known as Rue Valley in Lake County. Each of the plaintiff-couples contracted to have a house built on their lot by the defendant. There was neither sewer nor water available in the subdivision and a well and septic system was necessary for water and sewage disposal.

The two building contracts were entered into in August and September of 1976. Construction of the dwellings then proceeded and the Poor house was completed and the transaction closed in June 1977, and the Fent house completed and the closing was in May 1977.

In the fall of 1977, Mrs. Poor noticed an apparent problem with the septic system when "ponding" occurred at the southern end of their lot. Mr. Fent also noticed a pond of water at the southwestern and western parts of their yard. Both the Poors and the Fents testified at trial that such ponding had continued in varying degrees up to the date of trial (January of 1981). Both the Fents and the Poors continued to use the septic systems during 1977 and 1978. However, Richard Fent testified that in January and March 1978 he called the attention of Robert Di Mucci to the flooding

at the south end of his lot. Nothing was done about this situation. In May 1978 Fent wrote a letter to Di Mucci complaining of the leakage at the south end of the septic field and again requested Di Mucci's assistance. He took pictures in April of 1978, showing the wet condition of the south end of his yard. He testified that in August 1978 some additional drain tiles were installed by Di Mucci on his lot, but these seemed to have little or no effect on the ponding condition. On October 4, 1978, the Lake County Health Department sent a letter to Di Mucci Home Builders, Inc., advising it that an inspection made by that department on September 16, 1978, had revealed problems with the septic systems on both Lots 24 and 25. In that letter it was indicated that a suspected old field tile (farmer's drain tile) was contributing to the flooding of the septic systems on these lots, and it was recommended that this old field tile be relocated and routed around the septic systems. It was also noted by the health department that on the Poors' lot (Lot 24) the well was located too close to the septic tank and the septic field. The Fents received a notice of a health violation from the Lake County Health Department for a failing septic system in October of 1978. At the same time, the Poors received a notice from the health department of a violation for a faulty septic system and also because the well was located about 35 feet from the septic field, whereas it should not be closer than 75 feet. The Poors also received at this time a report from the laboratory of the county health department stating that an analysis of their drinking water from their well showed it to be unsatisfactory for drinking purposes. Mrs. Poor testified that she boiled their drinking water for a considerable time after that.

The condition of flooding of the septic systems on the plaintiffs' lots persisted into early 1979, and in April of that year the plaintiffs retained a civil engineer, Hugh Cahill, who was familiar with the installation of septic systems, to inspect and make recommendations to remedy the defects in the systems on Lots 24 and 25. In June of 1979, Cahill made separate reports to the Poors and the Fents outlining the conditions he had found, the reasons therefor, and his recommendations for curing the defects. As to the Fents, he recommended locating and rerouting the farm drain tile which he had discovered to run beneath a portion of the Fents' septic field and which he believed was contributing to the flooding of the septic system. He also was of the opinion that the top soil on the Fent lot had been stripped of from .7 to 1.7 feet of black earth and the soil in which the septic laterals were embedded was mostly clay, resulting in poor drainage for the system. He recommended bringing in new soil of greater permeability. Cahill found that a curtain drain installed by Di Mucci was too close to the septic lines, and he recommended relocating the curtain drain at least 10 feet from the septic line. The recommendation for the Poors' lot was the same and, in addition, he found that the Poors'

well was located too close to both the septic tank and the septic field, being in violation of the county health regulations in both respects.

In October 1978, the plaintiffs filed separate complaints against Di Mucci Home Builders, Inc. Both complaints were in two counts. The Fents' complaint in count I alleged breach of contract in (1) installing the septic system over an existing farm drain tile; (2) in stripping the black soil from the lot and removing it so that the septic field was installed in impermeable clay soil; (3) in incorrectly landscaping the lot, creating a drainage problem. Count II alleged breach of an implied warranty that the dwelling would be built in a workmanlike manner and be reasonably fit for the habitation of plaintiff and his family. The Poors' complaint was likewise in two counts, count I alleging breach of contract in building the water well within prohibited distances from the septic tank and field, in installing the septic system where it was crossed by a farmer's drain tile, and in stripping the lot of black soil. Count II alleged a breach of an implied warranty of habitability.

At the trial, a great deal of testimony was taken up with the question of whether an excessive amount of black soil had been stripped from the lots prior to the installation of the septic systems, thus impairing the permeability of the soil and destroying the effectiveness of the drainage. Cahill, as a witness for the plaintiffs, testified that by comparing the original elevations of the two lots as shown in a U.S. Geodetic Survey Map with the elevations found by his survey of the lots after the septic system had been installed, he was able to determine that the original elevations of the two lots had been lowered by between 1 foot and 1.7 feet. This meant, he testified, that nearly all the more permeable top soil had been removed, leaving the septic laterals to drain into impermeable clay soil, thus greatly impairing the effectiveness of the septic fields. The contention that a great deal of top soil had been removed from the lots and used elsewhere was reinforced by the testimony of Mrs. Poor, who testified that she had observed Di Mucci trucks hauling black dirt away from a mound of black dirt at the lower end of her lot sometime after they moved in. Mr. Poor testified that in digging a garden on the lot he noticed that the black soil became much thinner toward the rear of the lot. Mr. Fent testified that prior to moving into the house he noticed that much of the black earth had been stripped from his lot and there was a large mound of earth toward the back of the lot, but that this earth was never spread back on his lot but simply disappeared.

A controversial point was introduced when the trial court allowed into evidence a 1975 letter from Mr. William Mellen, coordinator of the Individual Sewer (septic system) Program of the Lake County Health Department addressed to Di Mucci Home Builders, Inc., in which Mellen noted that a number of lots in Rue Valley Subdivision had been stripped

"to a point where they would be unsuitable for individual disposal systems." The letter stated that the subdivision was 80% unsuitable for septic systems and that the lots needed to be upgraded, so that the removal of even six inches of top soil would make them unsuitable for septic disposal. The letter did not refer to the lots in question here and was dated some two years before any trouble was noted in connection with the lots in question and, indeed, before those lots were purchased by the plaintiffs. Di Mucci, therefore, objected to the admission of this letter as being irrelevant and prejudicial to the defendant on the theory that evidence of other similar acts of a person are not relevant to prove his conduct on the occasion which is being tried. Mr. Mellen personally testified regarding the composition of soils and the effect of impermeable soil on septic drainage, but did not express an opinion that the lots in question had been stripped. Over objection, the letter written by Mellen in 1975 to Di Mucci, regarding other lots adjacent to the ones in question being stripped, was admitted as having probative value, indicating a pattern of conduct. It will be noted that this ruling became a point of appeal.

There was also controversy over the location and effect of the farmer's drain tile. Di Mucci contended it was the sole source of the flooding of the septic fields and that it was not responsible for its location since it had been installed long before building on the lots. Di Mucci took no responsibility for the effect this drain tile had on the septic system. There was some controversy over whether the drain tile was intact or had been broken by Di Mucci during building operations, thus aggravating the flooding of the septic system. Di Mucci conceded that as to Lot 24 the well was incorrectly located and would have to be moved.

As to the stripping of the lots, this question also became a point of appeal due to a sanction imposed on Di Mucci. Prior to the commencement of the trial, Di Mucci had engaged a civil engineer by the name of Ciaglia to make borings on the lots in question to determine the amount of black soil in the vicinity of the septic fields. Di Mucci had obtained permission to go on the plaintiffs' lots to make these borings as part of a discovery motion prior to trial, which gave Di Mucci 21 days from the date of the order to do so. Counsel for the plaintiffs was present when these borings were made, apparently in December 1980, and he orally admitted that he noticed black dirt in the borings. Because of this admission, the defendant later claimed that it had assumed the issue of the stripping of the black dirt from the plaintiffs' lots would not be pursued as an issue at the trial. However, at the beginning of the trial, January 27, 1981, the plaintiffs immediately raised the issue of the stripping of the lots, and Mrs. Poor gave testimony that it had occurred according to her observation. During the trial, sometime between January 27 and February

5, 1981, the plaintiffs discovered that the defendant had, without further application to the court or notice to the plaintiffs, entered upon the plaintiffs' lots again and made further borings. Upon discovery of this further unauthorized entry onto the plaintiffs' lots, plaintiffs' counsel moved to exclude any evidence of such further and additional borings. The court granted the motion as a sanction for violation of discovery rules, since the original motion was for a pretrial discovery and did not extend to the later borings. The defendant contended that the sanction excluding the later borings should not have been imposed because the plaintiffs' counsel, by his conduct, had misled the defendant into thinking the issue would not be raised and after giving that impression had later raised the issue of stripping of the lots, thus requiring additional evidence on the defendant's part.

Following the trial and rendition of judgment in favor of the plaintiffs, the defendant, in a post-trial motion, raised an issue of what it termed "newly discovered evidence." This evidence was in the form of two letters written in April of 1978 and May of 1978, by Fent and Poor, respectively, listing defects or remaining work to be done on their homes. Neither letter mentioned the septic system problem, although it was testified to as having been first noticed in 1977 and again early in 1978. Di Mucci claimed the letters had been in a field office and undiscovered by it prior to trial, and therefore were not produced at trial, thus constituting new evidence discovered since the trial, which might have affected the trial court's judgment, if offered at trial. The trial court rejected the defendant's post-trial motion. The defendant contends the court erred in not granting a new trial on the basis of such newly discovered evidence.

Lastly, the defendant contends that the award of damages was excessive. This contention was raised and argued in the post-trial motion and was rejected by the trial court. It is a further assignment of error.

■■ We have considered the points raised by the defendant as grounds for granting a new trial and do not find any of them persuasive. While we are inclined to agree with the defendant's contention that the 1975 letter of county employee Mellen was not probative as to the defendant's current activities (see *Vuletich v. Bolgla* (1980), 85 Ill. App. 3d 810; *Herget National Bank v. Johnson* (1974), 21 Ill. App. 3d 1024), we do not consider its admittance into evidence to be reversible error in this case. Where, as here, the judge was the trier of fact he may be assumed to have weighed the probative effect of the letter in the light of general doctrine as reflected in the Illinois cases and to have accepted it as general information tending to show notice to Di Mucci of the soil conditions in the vicinity, rather than as proof of specific current conduct. The general intent of Mellen's letter was to establish the point that the soil throughout the subdivision was critical as to septic systems, with no margin to spare

for any reduction in its permeability by stripping operations. Mellen, who wrote the letter, was available to testify and did testify generally as to the soil conditions in the subdivision. He did not express an opinion as to whether the particular lots in question had been stripped. He was, of course, subject to cross-examination. In view of these facts we do not consider the admission of the 1975 letter dealing with nearby lots in the same subdivision as being prejudicial to the extent of constituting reversible error. Even if it were held to be error, we do not consider the admission of this letter, where there was no jury to be prejudiced thereby, to be so harmful as to require a new trial.

We believe the trial court ruled correctly on the defendant's motion for a new trial based on newly discovered evidence consisting of letters from the two plaintiffs in which they listed certain defects or remaining work to be done on the houses themselves without mentioning the septic systems. Actually these letters, which were in the nature of follow-up letters written toward the end of the 12-month period of warranty, cannot be regarded as any kind of positive evidence with regard to the septic systems. Any effect favorable to the defendant from these letters would only be by implication—that is, by the assumption that the septic systems would have been mentioned when listing work still to be done or corrections to be made by the builder, if the septic systems were a problem. However, this omission is not evidence in the sense required for a new trial—it only gives rise to an implication which must be overcome by positive proof. In this case, even the implication is dubious when we consider the timing of other relevant events. The "ponding" effect at the end of the lots had been noted by the plaintiffs in the fall of 1977 but Di Mucci had explained it as being due to a broken farmer's field tile which Di Mucci said he would reroute and thus correct the situation. When flooding of the septic system became apparent later in the year, the plaintiffs complained, first to Di Mucci, then to the county. It was not until October 4, 1978, that the plaintiffs received letters from the county health department and were actually aware that the septic systems were defective.

■■ Moreover, the letters in question were written in April and May of 1978, whereas the trial of these cases did not begin until January of 1981. In the meantime, the defendant had numerous motions served on it seeking discovery on various aspects of the case, alerting the defendant to its problems of defense. Due diligence by the defendant should have uncovered these letters as evidence long before trial. It is reasonable to assume that due diligence to find all the evidence tending to support the defendant's case was not exercised when the defendant failed to uncover these letters which it now contends are crucial evidence. Motions for a new trial on the basis of newly discovered evidence are not favored and

are subject to certain requirements. Fundamental to the granting of a new trial on the basis of newly discovered evidence is that (a) the evidence is of such a nature that it may change the result of the case; (b) that the person offering it could not have discovered the evidence before the trial, even by the use of due diligence. (*Halka v. Zupan* (1979), 68 Ill. App. 3d 616; *Van Dyke v. Good Samaritan Sheltered Care Home Corp.* (1976), 38 Ill. App. 3d 187.) Neither of these requirements was met in this case. The defendant obviously did not exercise due diligence in failing to uncover a letter received by it some 2½ years prior to trial and in its possession all of that time. Nor was the nature of the "evidence" uncovered such as to mandate a different result—the letters produced at most merely an inference of acceptance of the septic systems but utterly failed to rebut the evidence at trial that the systems were actually found to be defective, not only by the plaintiffs, but by two septic field experts and by the Lake County Health Department. We see no error in the denial of the motion for a new trial.

■■ The defendant further contends that the court erred in refusing proffered evidence as to sample borings taken after trial began. It was claimed by the defendant that it was misled by remarks by the plaintiffs' attorney Duval, after he saw the sample borings of the soil on the Fent lot and supposedly said that they showed black dirt present and the question of stripping would not be pursued further. Duval, in an affidavit, denied making these remarks—while admitting that he noticed black dirt in the borings, he said no commitment was made as to how this would affect the trial. We do not believe the raising of the issue of stripping at the trial justified the defendant's unauthorized intrusion onto the plaintiffs' lots during the course of the trial. The trial court's limited sanction in refusing to admit evidence based on this second set of borings was, we think, within its proper discretion.

■■ The defendant contends, lastly, that in any event the case must be remanded because of the failure of the trial court to delineate any satisfactory basis for the amounts awarded as damages. In reviewing the testimony at trial as to damages, we find it somewhat confusing. However, the totals arrived at by the trial court do not appear unreasonable based on the testimony. Hugh Cahill, a civil and sanitary engineer, testified as an expert witness as to the cost of replacing the septic systems and his estimate was not greatly at variance with that of the witness, Weidner, as to septic systems costs—that is, around $15,000. In addition, there was the cost of rerouting the farmer's drain tile and the landscaping necessary to restore the lots to their original condition. Engineering fees for previous exploratory work should also be included since these costs were borne by the plaintiffs. There is some uncertainty as to whether the original system should be left in the ground or removed. Originally Cahill

suggested removing the existing system and relocating it. In later testimony, however, he suggested that the soil on the lots having been saturated, it would be advisable to retain the old system as a back-up system and create a new system elsewhere on the lot. This had significance as to the Poors' lot since it would involve not only the cost of a new septic system but also relocating the well, inasmuch as it was too close to the existing system, and would be a problem if the old system was used as an auxiliary. The estimated cost of removing the well of $4,500 was not disputed. A question arose as to Cahill's estimate of $2,400 for landscaping costs for the lots after the septic fields were either relocated or improved by bringing in enough fill to make the earth surrounding the laterals sufficiently permeable, plus relocating the farmer's drain tile. While Cahill was admittedly not in the landscaping business, he had been exposed to such costs in connection with the rerouting or replacement of existing septic systems. Bearing in mind his familiarity with the after effects of relocating or replacing existing septic systems on half-acre lots in similar subdivisions, we think he was sufficiently qualified to give an estimate of the cost of restoring the lots in question to their original landscaped condition. The witness, Weidner, whose business was installation of septic systems, estimated the septic system cost for the Fent lot, including relocating the famer's drain tile, to be around $19,000. This did not include restoration of the landscaping on the Fents' lot or the bill for Cahill's preliminary report which would add an additional $2,000 or $3,000 to the cost. We believe, therefore, that while inexact, the figures of both Cahill and Weidner were within a fair range of the amounts awarded by the trial court. We see no basis, therefore, for awarding a new trial on the issue of damages only.

The judgment of the circuit court of Lake County is affirmed.

Judgment affirmed.

HOPF and REINHARD, JJ., concur.