453 So.2d 1226 (1984)
Willie Mae COFFIL
v.
NEW ORLEANS PUBLIC SERVICE, INC.
No. CA 1490.
Court of Appeal of Louisiana, Fourth Circuit.
June 6, 1984.
Rehearing Denied August 24, 1984.
*1227 Steven M. Koenig, Heisler & Wysocki, New Orleans, for plaintiff-appellee.
James Maher, III, New Orleans, for defendant-appellant.
Before SCHOTT, LOBRANO and WARD, JJ.
SCHOTT, Judge.
Plaintiff was injured while boarding a bus owned by defendant, New Orleans Public Service, Inc. After trial by jury she was awarded $100,000. Defendant has appealed seeking a reduction in the award. Liability is uncontested. The issue is whether the jury abused its much discretion in the amount of the award.
Plaintiff is a widow who was 49 years old at the time of trial on May 19, 1983. She was employed prior to the accident on January 27, 1982 in various capacities at different times, including stock clerk at a department store, baby sitter, nurse's assistant, beautician and seamstress. She said she was an independent person before the accident, in that she did her own grocery shopping and house cleaning. Since the accident, however, plaintiff must depend on her daughter to do these chores. Her daughter must even assist her in getting out of the bathtub. Additionally, plaintiff has had to decrease the frequency of her church going because she is no longer able to walk to and from the church. Plaintiff is also no longer able to exercise or attend concerts and movies, her favorite pastimes prior to the accident. Plaintiff has gained approximately 25 pounds since the accident, she claims because of inactivity resulting from her injuries. She said she gets depressed periodically because of her limited lifestyle caused by the accident. Plaintiff is no longer able to sit or stand for long periods of time without being in pain. Plaintiff's daughter testified that her mother complains about her health almost daily, whereas, before the accident she rarely complained. Plaintiff said she gets "stiff" from sitting down, her ankle becomes weak when she walks and her toes "tuck under" involuntarily. She takes hot baths and uses a heating pad twice a day, every day, for temporary relief. She wears a back brace and is unable to lift anything heavy.
Plaintiff sought the medical services of Dr. A. Z. Blamphin, a general practitioner, the day after the accident. He testified as follows: She was seeing him weekly until March 11. She complained of pain in her right foot, knee, thigh, hip, and lower back. Although there were intermittent remissions *1228 of this pain to some extent, the pain persisted in her back and leg. He was under the impression that she had a lumbosacral sprain and prescribed medication and physical therapy treatments. However, because she continued to have problems he recommended that she see an orthopedist. When she returned to Dr. Blamphin on April 28 she had gone to Dr. Charles Billings, an orthopedist, and pending a report from him, Dr. Blamphin discontinued plaintiff's physical therapy treatments of which she had received a total of thirty over a three month period. She returned to him on July 29 complaining of her back pain then radiating into the right leg. This led him to suspect a disc problem and to recommend that she get a Cat Scan which was done at Hotel Dieu Hospital on August 9. This revealed "abnormal bulging disc space structures with most prominent deformities at L4-S, L5-S1 levels." When she next returned to Dr. Blamphin on September 30, she was wearing a lumbosacral corset which had been prescribed by Dr. David M. Jarrot, a neurosurgeon, whom she had begun to see. Her last visit to Dr. Blamphin was on November 8 when she was still complaining of the toes in her right foot "tucking under," stiff right ankle, cramps in the right leg, pain in the right thigh on sitting, and pain in her right hip and groin. His final impression was that plaintiff had a ruptured disc with nerve root radiation pain. Her bill for services totaled $1295.00.
Plaintiff first saw Dr. Charles Billings, an orthopedist, on April 1,1982. His examination revealed tenderness in the low back and buttocks, especially on the right and limitation of motion. He found no evidence of spasm or neurological deficit and muscle strength was normal in both legs. Based on his examination and the X-ray studies previously made he diagnosed a resolving lumbar strain with possible disc problems. He recommended physical therapy, medication, and restriction of activities. When she next returned on May 20 her condition was unchanged, but upon returning on July 8 she had some improvement in the low back but she complained of pain in the right knee and ankle. The doctor prescribed continuing conservative treatment but maintained the diagnosis of possible disc problems. He next saw her on December 7 and found she had improved with only intermittent pain in her low back and no evidence of nerve impairment. Because of her apparent positive response he continued to prescribe conservative treatment. However, when she returned on March 8, 1983, she complained of increased symptoms. His examination revealed tenderness and pain in her back with radiation into the leg during the straight leg raising test. He felt that this demonstrated the possibility of nerve irritation from back problems. He still advised non-operative, conservative treatment with a change in medication to better control her symptoms but he now felt that the persistence of her symptoms, if unchecked by the medication change, required further evaluation of her spine such as a myelogram or discogram. He described these procedures as uncomfortable and involving a hospital stay of three or four days and said the radiologist's fee would be between $175 and $250. Plaintiff was last seen by Dr. Billings on April 19, 1983, a month before trial, at which time her symptoms were about the same. He stated that he would continue treating her conservatively unless she could no longer tolerate her pain or if objective evidence of nerve damage were present. On cross examination he stated that her history was consistent with lumbar disc disease caused by the aging process but changed or aggravated by the accident. He felt that she should restrict her activities of lifting and bending as well as sitting and standing and he advised her to return for conservative treatment on an as-needed basis. In answer to whether her disc problem might resolve itself as time passes he stated that once a disc has bulged it will not return to normal and while she may improve somewhat she would never be free of all pain.
Plaintiff consulted Dr. David Jarrot, a neurosurgeon, on August 19, 1982. She complained of back pain radiating into the *1229 right buttock and leg with muscle cramps in the right foot. On examination he found limitation of motion, muscle tenderness, and a slight degree of muscle spasm in the back. He reviewed the Cat Scan done on August 9 and found abnormal bulging of the discs at L4-S and L5-S1 with arthritic changes or overgrowth, hypertrophy of the facet joints. He diagnosed lumbar irritation or neuralgia secondary to lumbar spondylosis or degenerative bulging disc aggravated by the injury she sustained in January. He prescribed a lumbosacral corset to be worn a few hours each day and a return to him in six weeks. When she returned she still complained of pain but said the corset had helped and she was able to perform some housework. Upon examination he found tenderness and limitation of motion, positive straight leg raising test, but no spasm. He held to the same diagnosis as before, recommended her continued use of the corset, but formed the opinion that she could not be completely cured even with surgery which he discussed with her as an alternative form of treatment. Asked whether she would have had the problems because of her spondylosis even without the accident Dr. Jarrot referred to plaintiff's statements that she had no problems before the accident and stated that it was "characteristic" of middle aged patients with degenerative spine disease that symptoms are minimal or not felt at all until they experience trauma. Plaintiff was last seen by Dr. Jarrot on December 29, 1982. She stated her back pain was less in general but that she had increased pain from standing or walking for long periods, stooping, or doing heavy housework beyond cooking and washing dishes. She was still wearing the corset and taking the arthritis medicine. His examination revealed that her condition had improved. His final diagnosis was the same as before but with clinical improvement. He recommended exercises designed to perpetuate this improvement and rated her ten percent functionally disabled.
Dr. Jarrot testified extensively on the possibility that plaintiff might require surgery. He stated that this might be considered only if her symptoms worsened to a significant degree, but the risks and discomfort accompanying disc surgery are not warranted by her present condition. When he first saw her in August her condition was such that she was a candidate for surgery but she improved to the extent that he no longer recommended it. This could change if she had a relapse. He then went on to testify that such surgery would cost $13,000, that one operation may not be effective and that follow-up surgery may be required, and that she would be left with some disability even with successful surgery.
On cross examination Dr. Jarrot repeated that plaintiff had improved between August and December and she no longer had nerve root irritation on the final visit. At this time her problems were associated with her muscles. Asked what her chances were to have problems in the future he stated that "for a patient with this particular collection of symptoms, clinical course, response to treatment, I would expect one or two patients in ten to deteriorate to the point where surgery becomes a serious consideration." He stated that it was "more than likely" that she had some degenerative changes before the accident, and he explained her ten percent functional disability to mean that she could perform nine out of ten given tasks. He further explained that her restrictions consisted of "avoiding activities that are regularly productive of increased pain or use of common sense in avoiding lifting over thirty or forty pounds;" and "repetitive bending, crawling, squatting, or stooping" as might be associated with heavy housework.
In analyzing the jury's verdict of $100,000 we must first recognize that none of this involves loss of earnings. It does include medicals which consist of about $1300 for Dr. Blamphin, $500 for Drs. Billings and Jarrot, $400 for the Cat Scan, and about $200 for prescriptionstotal $2400. If plaintiff is entitled to recover for the cost of the myelogram discussed by Dr. Billings and the surgery discussed by Dr. Jarrot an additional amount of about $15,000 *1230 would be incurred. However, we have concluded that the evidence did not establish with legal certainty, i.e. more probable than not, that these procedures would be undertaken.
As to the myelogram by Dr. Billings, he would consider this only if plaintiff's pain could no longer be tolerated or if objective evidence of increasing nerve damage were present. Nowhere in his testimony does he state this to be a probability. Similarly, Dr. Jarrot made it clear that he was not recommending surgery but held it out as a possibility if her symptoms worsened. Thus, we have concluded that only $2400 special damages were properly included in the award. The question remains whether $97,600 constituted an abuse of the jury's much discretion.
The record establishes that this plaintiff has been caused considerable pain and suffering and changes in her life because of defendant's negligence. On the other hand, some of her problems are due to her degenerative spine disease of spondylosis which pre-existed her accident and which would probably give her some trouble even without the accident. While she has had flareups from time to time all three of her physicians found improvement and thought conservative treatment was sufficient. This consisted of prescribed medication, hot soaks, exercises, common sense restriction of activities and occasional use of a corset. She had no surgery and there is no probability that it will ever be required. We are convinced that the jury based its award in large measure on the conclusion that plaintiff is faced with surgery because of the accident, but the record does not support this. Following Reck v. Stevens, 373 So.2d 498 (La.1979), we have concluded that the award constitutes an abuse of discretion.
Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977) dictates that the award be lowered to the highest point reasonably within the jury's discretion. We have concluded that $75,000 is the proper amount under all the circumstances.
Accordingly, the judgment is affirmed but amended so that there is judgment in favor of plaintiff and against defendant in the amount of $75,000 with legal interest from date of judicial demand until paid plus all costs of these proceedings except appellate costs which are assessed against plaintiff.
AMENDED AND AFFIRMED.