JILL MONDELLI *et al.*, Plaintiffs-Appellees, v. CHECKER TAXI COM-
PANY, INC., *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—88—2233

Opinion filed January 19, 1990.

Torshen, Schoenfield & Spreyer, Ltd., and Jesmer & Harris, both of Chicago (Jerome H. Torshen and Abigail K. Spreyer, of counsel), for appellants.

John P. Biestek & Associates, Ltd., of Arlington Heights (Edward A. Scott III, of counsel), for appellees.

JUSTICE MURRAY delivered the opinion of the court:

Defendants, Checker Taxi Company, Inc., and Alireza Nazarifroshani, appeal from a judgment of the circuit court of Cook County on verdicts returned in favor of plaintiffs, Jill Mondelli and Eileen Couillard, for personal injuries sustained by them when a Checker taxicab operated by Nazarifroshani collided with their automobiles, and the court's order denying their post-trial motion for a new trial or a remittitur of the damages awarded to plaintiffs. Defendants contend that the trial court erred in barring the testimony of one of their medical

experts and an investigator, they were denied a fair trial based on the cumulative effect of errors made by the court, and the award of compensatory damages to both plaintiffs was excessive and beyond the limit of fair and reasonable compensation for the injuries proved. For the reasons set forth below, we affirm.

The automobile collision underlying this cause occurred at approximately 1 a.m. on September 5, 1981. Plaintiffs Mondelli and Couillard, who are sisters, had just left a restaurant and were driving their separate cars when defendant's taxicab, driven by Nazarifroshani, collided first with Mondelli's car and then Couillard's. Immediately after the occurrence, plaintiffs were taken to the emergency room of St. Elizabeth's Hospital; Mondelli was X-rayed, given a prescription and discharged and Couillard was X-rayed and discharged. (Plaintiffs' subsequent medical history will be discussed later in this opinion, as will other facts as they pertain to the various issues raised.)

Plaintiffs filed the instant action on December 30, 1981, and trial commenced on January 13, 1988. Defendants admitted fault, and the matter was tried to a jury on the issue of causation and damages. The jury awarded Mondelli $333,256 in compensatory damages and $1,162,500 to Couillard. Defendants' subsequent post-trial motion for a new trial or a remittitur of the damages awarded plaintiffs was denied, and this appeal followed.

■ Disposition of defendants' first argument, that their expert Dr. Marshall I. Matz was improperly barred from testifying, turns upon the application of the physician-patient privilege rule enunciated in *Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232. Under the rule, *ex parte* communications between defense counsel and a plaintiff's treating physician are prohibited as against public policy because they *jeopardize* the sanctity of the confidential and fiducial physician-patient relationship. More particularly, "[d]iscussion of the patient's confidences under circumstances other than through formal discovery is *potentially* harmful to the interests of the patient in that the physician *might* disclose intimate facts regarding the patient which are unrelated and irrelevant to the mental or physical condition placed at issue in the lawsuit. (Emphasis added.) [Citation.] A plaintiff should be allowed to protect his physician-patient privilege *before* it is compromised." (Emphasis in original.) (*Karsten v. McCray* (1987), 157 Ill. App. 3d 1, 14.) Barring the testimony of a plaintiff's treating physician is an appropriate sanction to protect the privilege from defense interviews conducted outside formal discovery. *Karsten*, 157 Ill. App. 3d at 14.

Here, defendants argue that the trial court erred in barring Dr. Matz's testimony based on its determination that a physician-patient relationship existed between him and plaintiff Couillard. They contend that no such relationship existed merely because, as plaintiffs argue, Dr. Matz's office associate, Dr. James Dupre, saw Couillard as a patient shortly after the accident in 1981. More specifically, as argued by defendants in the trial court:

"In September 1981, he [Dr. Dupre] acted on two occasions at Columbus Hospital as a neurological consultant to Dr. James McHugh, the treating physician of Mrs. Couillard at that time. *** He [Dr. Dupre] was not an attending physician. He didn't see her on a daily basis *** or anytime after that or anyone else from the office until April or May 1987 when we asked him [Dr. Matz] to review only the CAT scan and x-rays which were taken in November 1982 and sometime in 1984.

* * *

There was no ongoing relationship of this woman with that office. This office was not the attending physician for this woman at that time.

* * *

If I had said to the Court that I had sent those records to Dr. Dupre and Dr. Dupre had reviewed the CAT scans and x-rays some six years later, then I could certainly see the Court saying, *** you cannot use Dr. Dupre.

*We're talking about Matz. We're talking about another doctor in the office in a rather very casual physician-patient relationship.* We're not talking about an *ongoing relationship* that this woman had with the office." (Emphasis added.)

Defendants further point out in their appellate brief that: since Dr. Matz never saw Couillard, he never shared any of her "confidences" and therefore he was not in a position to take unfair advantage of her; his testimony did not pertain to any information obtained by his associate, Dr. Dupre; there is no suggestion that he engaged in any *ex parte* discussion of confidential information disclosed by Couillard; and there was no showing that Matz was privy to or had access to any confidential or medical information pertaining to Couillard which may have been obtained by Dr. Dupre when he saw her in September 1981 and, in fact, his opinion was sought only as to diagnostic tests and treatment of Couillard from and after November 1982.

■ We first observe, as defendants themselves point out, any *ex parte* communication with Dr. Dupre would clearly have been in violation of the physician-patient privilege (*i.e.,* sending the same diagnostic

tests to him as they sent to Dr. Matz) prior to trial. We fail to comprehend, therefore, defendants' insistence that Dr. Matz has any less of a confidential and fiducial relationship with Couillard in light of the fact that Dupre is a professional associate in Matz's business office as indicated by a statement from Dr. Dupre to Couillard for services rendered which bears the following information: "Marshall I. Matz, M.D. & David M. Shenker, M.D., S.C.; *Neurosurgery, Marshall I. Matz and James F. Dupre* [emphasis added]; Neurology, David M. Shenker." Moreover, we especially note that both Dr. Dupre and Dr. Matz specialize in neurosurgery, all three doctors practice in the same suite and they have the same telephone number. As an associate of Dr. Matz, Dr. Dupre's status as a treating/"consulting" physician must be imputed to Dr. Matz, requiring application of the physician-patient privilege *Petrillo* rule concerning any *ex parte* communications between defense counsel and Dr. Matz. See *Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313 (a defendant hospital was prohibited from communicating with the plaintiff's treating physicians despite the fact that the physicians were members of the defendant's hospital staff).

We further find without merit defendants' "distancing relationship" theory which would preclude application of the physician-patient privilege. It is unclear whether defendants argued to the trial court that Dr. Dupre's or Dr. Matz's relationship with Couillard was "a rather very casual physician-patient relationship." However, as the trial court so aptly pointed out, the only issue before it was whether a physician-patient relationship existed between Dr. Dupre and Couillard, and thus, by professional association between Dr. Matz and Couillard. More particularly, the court stated that "it would be disasterous if we were to open up a line of cases that would allow this [distancing theory] because then it becomes a question of distance, and the test does not become the doctor-patient relationship anymore, but a question of *** the quality and extent of the relationship." Accordingly, we hold that a physician-patient relationship existed between both Dr. Dupre and Dr. Matz with Couillard.

■■ Having established the existence of a physician-patient relationship between Dr. Matz and Couillard, we next turn to defendants' argument that Matz never obtained any confidential information from Dr. Dupre concerning Couillard or from Couillard herself, and that since his testimony concerned only diagnostic tests performed *after* Couillard's association with Dr. Dupre and not any which he might have vicariously obtained from Dr. Dupre, his testimony should not have been barred because it "would not have resulted in the disclosure

of patient confidences outside the scope of the Illinois Supreme Court rules pertaining to discovery." In support thereof, defendants rely on *Tomasovic v. American Honda Motor Co.* (1988), 171 Ill. App. 3d 979, 991-92, *appeal denied* (1988), 122 Ill. 2d 595, where this court stated:

"Dr. McDonald [defendant's witness] was not called as a treating physician. Instead, he had been an intern who took plaintiff's history. He was called as a person to whom plaintiff made an admission. He testified regarding that recorded admission. Thus, the *Petrillo* rule is not applicable.

Moreover, there is no allegation here that Dr. McDonald was in possession of any confidential information from plaintiff or that he ever discussed confidential information with defense counsel. Plaintiff admits that the only subject at issue was the recorded history. We note that plaintiff's counsel was given unlimited opportunity to conduct examination on *voir dire* and to interview the doctor privately before he testified. *** No error occurred."

Defendants assert that since Dr. Matz was not called as a treating physician, but rather as an expert, the *Petrillo* rule is inapplicable to him. However, we need not address this alleged distinction since we have already determined that Dr. Matz wore the additional hat of a treating physician through his association with Dr. Dupre.

Defendants next contend that, in accordance with *Tomasovic*, even if a physician-patient relationship existed between Dr. Matz and Couillard, plaintiffs had the burden of showing, but failed to do so, that Dr. Matz was in possession of confidential information from plaintiff and that he discussed that information with defense counsel. We disagree.

We first observe that *Tomasovic* is factually distinguishable from the case before us and is limited to its facts. In *Tomasovic*, the doctor called by the defense was an intern who merely "saw" the plaintiff in the emergency room and wrote in his medical chart that the plaintiff was "alert, oriented to time and place and cooperative," and also wrote down the plaintiff's description of his accident. There is no suggestion in *Tomasovic* that the doctor ever "treated" the plaintiff. Accordingly, the doctor was not a treating physician, but rather, as the *Tomasovic* court found, merely a recorder of an admission made by the plaintiff to him, and the *Petrillo* rule was therefore inapplicable. In the instant case, however, a physician-patient relationship existed between Dr. Matz and Couillard, albeit that it was based on Dr. Dupre's treatment of plaintiff and his professional association with Dr. Matz.

Since *Tomasovic* is inapplicable under the circumstances here, defendants' contention concerning Dr. Matz's alleged lack of posses-

sion of confidential information about Couillard is irrelevant. For the sake of clarification, however, we note that in *Petrillo* and its progeny (see *Ritter v. Rush-Presbyterian-St. Luke's Medical Center* (1988), 177 Ill. App. 3d 313; *Yates v. El-Deiry* (1987), 160 Ill. App. 3d 198; *Karsten v. McCray* (1987), 157 Ill. App. 3d 1), no allegations of *specific* disclosures of the plaintiffs' confidences were made by the plaintiffs or specifically addressed by the reviewing courts as being necessary to invoke the physician-patient privilege rule. All of the cases on this issue refer to the *potential* harm to the physician-patient relationship and the fact that confidences irrelevant to the injury at issue *might* be revealed in *ex parte* communications between defense counsel and the plaintiffs' treating physicians. In fact, as stated in *Yates v. El-Deiry* (1987), 160 Ill. App. 3d 198, 203, "[p]rejudice and improper conduct can be implied from the fact that the plaintiff's treating physician has violated his ethical and fiduciary obligations owed to his patient by engaging in *ex parte* conferences concerning the patient with the patient's legal adversary and without the patient's consent." Even measures used by the court to limit a physician's testimony under these circumstances, such as protective orders and motions *in limine*, have been found to be insufficient to remedy "the *potential* breaches of trust that will occur should defense counsel be given an unfettered right to engage in *ex parte* conferences with a patient's treating physician." (Emphasis added.) (*Petrillo v. Syntex Laboratories, Inc.* (1986), 148 Ill. App. 3d 581, 601, *cert. denied* (1987), 483 U.S. 1007, 97 L. Ed. 2d 738, 107 S. Ct. 3232.) Accordingly, it is clear that the physician-patient privilege is violated at the time of an *ex parte* conference between the plaintiff's treating physician and defense counsel regardless of what information is actually revealed therein.

■ We also reject defendants' argument that even if a physician-patient privilege existed between Dr. Matz and Couillard, plaintiff's motion to bar Matz's testimony was not timely made and therefore waived. The record discloses that trial commenced in this matter on January 13, 1988. On May 30, 1986, Couillard listed Dr. Matz as a consulting doctor on her pretrial memorandum, the entry having been made as a result of a bill she had received for the services of Dr. Dupre. On August 5, 1987, plaintiffs notified defendants' counsel, both orally and in writing, of their objection to the use of Dr. Matz as their expert. On August 7, defendants responded by letter to plaintiffs that despite the conflict referred to by plaintiffs, they intended to use Dr. Matz and would not seek another expert since a new expert could not be obtained prior to the trial date of August 19. Thereafter, plaintiffs' counsel advised defendants that he had no objection to continuing the

trial to allow defendants time to obtain a new expert. During this time plaintiffs cancelled a scheduled deposition of Dr. Matz. The case was in fact continued for trial on August 19 to January 11, 1988, based on plaintiffs' motion which alleged problems of ill health of one of plaintiffs' counsel. Subsequently, on the second day of trial, plaintiffs moved to bar Dr. Matz from testifying and the court granted their motion. Defense counsel then made an offer of proof as to what Dr. Matz would testify to, stating:

"Dr. Matz would testify that he was *unable to state* that Mrs. Couillard suffered an intervertebral disc herniation related to an episode in 1981 that necessitated the chemonucleolysis of 1983 and the operative procedure on her lower back in 1985." (Emphasis added.)

Defendants contend that plaintiffs put them in a "Hobson's choice" of expending time and funds to obtain an alternative expert or of presenting the issue to the court by failing to object earlier and to thereafter pursue a ruling from the trial court prior to trial on their objection to Dr. Matz's appearance as their expert. Defendants also assert that plaintiffs' inaction on their objection to Dr. Matz reasonably led them to believe that plaintiffs had reconsidered their objection.

Contrary to defendants' assertions, we find that this is not a case of a last-minute disclosure of an expert on the courthouse steps or during the course of trial which section 2—1003(c) of the Code of Civil Procedure was designed to prevent (Ill. Rev. Stat. 1987, ch. 110, par. 2—1003(c)). There is nothing in the record to suggest that plaintiffs' counsel's oversight of the conflict concerning Dr. Matz as defendants' expert was an intentional strategy designed to delay or prejudice defendants, as defendants argue. In fact, plaintiffs' counsel advised defendants that he would agree to a continuance of the trial so that defendants could obtain another expert. In addition, defendants could not reasonably have assumed that plaintiffs had reconsidered their objection to Dr. Matz in light of the fact that plaintiffs had cancelled the scheduled deposition of Dr. Matz and stated in their letter that they would schedule a deposition of a substitute expert prior to trial. Also, once the case was continued, defendants had six months within which to obtain another expert or to bring the issue before the court themselves. Defendants' reliance on *First National Bank v. St. Charles National Bank* (1987), 152 Ill. App. 3d 923, for the proposition that plaintiffs had the burden of pursuing their objection to their expert is inapplicable here since that case pertains to attorney disqualifications, not experts. Thus, under the circumstances, defendants' "timeliness and waiver" argument is without merit.

For the reasons stated, we hold that the trial court properly barred Dr. Matz's testimony. Accordingly, we find it unnecessary to address the further issue raised by plaintiffs that defendants' offer of proof as to what Dr. Matz would testify to was insufficient at law and not properly preserved.

Defendants next argue that the trial court erred in barring the testimony of their private investigator, Rita Carroll. The record discloses that one year prior to trial Carroll went to a beauty shop owned by plaintiff Mondelli. While there approximately three hours, Mondelli shampooed, cut and permed Carroll's hair and serviced other customers. Carroll thus observed Mondelli in her occupation performing a variety of movements incident thereto. During the same time, Carroll engaged in conversation with Mondelli pertaining to Christmas shopping and holiday plans. At trial, defendants argued that Carroll's observations of Mondelli bore directly upon her claims of permanent and disabling injuries which allegedly prevented her from resuming her occupation full time, and were admissible evidence notwithstanding her "incidental" conversation with Mondelli. The trial court apparently concluded that Carroll's conversation with Mondelli constituted a deposition taken without notice to her counsel (see 113 Ill. 2d R. 206(a)), tainting "everything that occurred during that meeting" and, accordingly, barred Carroll's entire testimony.

■■ It is well settled that a private investigator's *observations* of a plaintiff in a personal injury suit are admissible where relevant to the issue of the extent and permanency of the plaintiff's injury. (*McGoorty v. Benhart* (1940), 305 Ill. App. 458.) However, the same is not true where *statements* are elicited by opposing counsel from a party without notice to the attorney known to be representing her. (See *Bruske v. Arnold* (1969), 44 Ill. 2d 132.) More specifically, Supreme Court Rule 7—104(a)(1) (107 Ill. 2d R. 7—104(a)(1)) provides:

"(a) During the course of his representation of a client a lawyer shall not

(1) communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so ***."

And Supreme Court Rule 206(a) (113 Ill. 2d R. 206(a)) provides for the procedure for taking depositions on oral examination, *i.e.*:

"Notice of Examination; Time and Place. A party desiring to take the deposition of any person upon oral examination shall serve notice in writing a reasonable time in advance on the

other parties. The notice shall state the time and place for taking the deposition; the name and address of each person to be examined, if known, or, if unknown, information sufficient to identify him; and whether the deposition is for the purposes of discovery or for use in evidence.''

Statements elicited in violation of these rules of professional responsibility and discovery are treated as illegally obtained evidence, and their admission will be barred at trial as a sanction. See *Bruske v. Arnold* (1969), 44 Ill. 2d 132.

Here, defendants do not claim any error by the trial court in barring Carroll's testimony relative to her conversation with Mondelli. They do argue, however, that the conversation cannot be construed as a deposition in violation of the rules cited above and, in any event, merely talking to Mondelli about Christmas shopping and holiday plans cannot be said to have tainted her observations of Mondelli at work, as the trial court so held. In support thereof, defendants rely on *Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.* (1984), 128 Ill. App. 3d 763. In *Fair Automotive*, the plaintiff brought suit against the defendant for interfering with its business by means of slanderous statements. The plaintiff subsequently hired investigators to go to the defendant's shops, posing as customers. While there, the investigators made references to a better estimate for services from the plaintiff's shops and, in response, the defendant's employees made disparaging remarks about the plaintiff. The trial court, in distinguishing between the investigators' observations of the defendant's conduct and eliciting a statement or taking a deposition of the defendant, stated:

"Defendants attempt to characterize the conduct at issue here as the pursual of depositions without proper notice. However, plaintiffs' investigators did not seek statements from the employees at the Car-X shops for their information or impeachment value. Rather, when the investigators heard the statement, it was a form of observing conduct. The term 'discovery' has been said to refer generally 'to *disclosure by defendant of facts,* deeds, documents or other things which are *in his exclusive knowledge or possession and which are necessary to [the] party seeking discovery as a part of a cause of action pending,* \*\*\* or as evidence of his rights or title in such proceeding.' [Citation.] The statements of the employees at Car-X shops did not constitute fact within the exclusive knowledge of defendants but rather constituted the conduct at issue in the lawsuit." (Emphasis added.) (128 Ill. App. 3d at 770-71.)

Accordingly, the court held that no violation of discovery rules oc-

curred as a result of the plaintiff's conduct in sending its investigators to defendant's shops.

Similarly, in the present case, we find that the statements made by Mondelli to Carroll concerning Christmas shopping and holiday plans cannot be characterized as a disclosure of facts within her exclusive knowledge or possession which were necessary to the defendants seeking discovery as a part of the cause of action pending. Nor is there any showing that Mondelli's statements were elicited for their information or impeachment value; the statements were, as defendants assert, merely ordinary "shop talk" between a customer and her hairdresser. It follows then that defendants did not violate the rule of professional responsibility which prohibits attorney contact with the opposing party upon the subject of a plaintiff's lawsuit without notice to the plaintiff's attorney. Although Mondelli is a party represented by an attorney who was confronted by defendants' agent without notice to her attorney, unlike the nonparty employees in *Fair Automotive*, the statements elicited from her by Carroll simply were not obtained with the intent to gain information relative to her injury and, in fact, they did not concern her injury. In other words, Carroll's conversation with Mondelli did not pertain to the subject of her lawsuit. Compare *Bruske v. Arnold* (1969), 44 Ill. 2d 132 (where the plaintiff's investigator went to the defendant's home with a court reporter and took a question-and-answer statement from the defendant without notice to the defendant's attorney, the court held the evidence was illegally obtained and barred its admission).

Notwithstanding the foregoing, we do not believe it was error for the trial court to bar Carroll's testimony concerning Mondelli's statements; they simply had no probative value. The same is not true, however, concerning the trial court's barring of Carroll's testimony of her observations of Mondelli. Where a violation of the rules discussed above occurs, an appropriate sanction is exclusion of the evidence improperly obtained. (*Bruske v. Arnold* (1969), 44 Ill. 2d 132; *Fair Automotive Repair, Inc. v. Car-X Service Systems, Inc.* (1984), 128 Ill. App. 3d 763; *Poor v. Di Mucci Home Builders, Inc.* (1982), 103 Ill. App. 3d 543.) Clearly, as previously discussed, Carroll's conversation with Mondelli had no probative value, and we simply do not comprehend plaintiffs' and the trial court's position that it tainted "everything that occurred during that meeting." As defendants point out, even if Carroll's conversation with Mondelli constituted improper conduct, she could have testified to her observations without reference to the conversation and, according to the case law cited above, we believe the improper evidence—the conversation—should only have been excluded.

Although the trial court erred in barring Carroll's testimony of her observations of Mondelli, we find its error harmless. Pursuant to defendants' offer of proof, Carroll would have testified that she observed Mondelli performing certain physical movements incident to shampooing, cutting and perming her hair and in servicing other customers. Carroll would also have testified that in her opinion Mondelli did not seem to be in pain. This testimony would have been consistent with Mondelli's testimony that she was able to work three and sometimes four days per week as a hairdresser, that she received periodic injections from her doctor to relieve her pain for certain periods of time, and that she used a TENS unit at work which allowed some relief from pain enabling her to perform her work. Mondelli never stated that she could not work but only that she could not work as many days or hours as she had been able to prior to the accident. Carroll's observations, therefore, contrary to defendants' argument, simply do not contradict Mondelli's testimony. Compare *McGoorty v. Benhart* (1940), 305 Ill. App. 458 (pictures taken of a plaintiff, who claimed serious and permanent injury and an inability to undertake any kind of exercise unless he wore a knee brace, were admissible evidence, especially in light of the fact that they showed the plaintiff doing things that he claimed at trial he could not do).

Defendants next contend that they were denied a fair trial based on the cumulative effect of errors made by the trial court. Specifically, they assert that as a result of barring the testimony of their expert, Dr. Matz, which bore on the issue of whether Mondelli's injuries were proximately caused by the accident, and the testimony of their investigator, Rita Carroll, which bore on the issue of the extent of Mondelli's injuries, they were prevented from fully presenting their case to the jury. Defendants also charge the following errors infected the trial with emotionalism and prejudicial inuendo, thereby playing upon the sympathies and passions of the jury: plaintiffs' counsel commenced the trial by arguing matters pertaining to fault, which was not an issue; plaintiffs wept in open court on three separate occasions; plaintiffs introduced the subject of defendants' insurance; plaintiffs continually volunteered statements, which were unrelated to the question posed; members of plaintiffs' families were permitted to testify to alleged effects of the accident which plaintiffs themselves did not claim; and plaintiff Couillard was allowed to submit evidence suggesting that defendants' conduct deprived her of the opportunity to bear children, even though there was no medical evidence concerning her ability to engage in sexual intercourse or to bear children. As a result of these errors, defendants argue that their cumulative effect resulted in deny-

ing them a fair trial and in the jury's alleged excessive and inflated damage awards to the plaintiffs.

■ For the reasons discussed previously, we reject defendants' argument that they were prevented from fully presenting their case to the jury as a result of the barring of Dr. Matz's and Rita Carroll's testimony. We also reject defendants' additional claims of trial error for various reasons. We first observe that defendants merely assert that they were prejudiced by plaintiffs' counsel's comments pertaining to liability, which was not at issue, in his opening statement to the jury. The extent of defendants' "argument" is their additional statement that "[a]rgument and questioning of witnesses on matters not at issue supported a new trial in *Di Maso v. Wieboldt Stores, Inc.*, 37 Ill. App. 3d 966, 347 N.E.2d 466 (1st Dist. 1976). See also *Gillson v. Gulf, Mobile & Ohio R.R. Co.*, 42 Ill. 2d 193, 246 N.E.2d 269 (1969)." In light of defendants' failure to sufficiently argue this issue and the fact that they do not cite to the record, we assume that the following comments by plaintiffs' counsel are the complained-of comments:

"Now, in this case, as his Honor has told you, the defendants have admitted liability. That is, they have admitted fault in this case.

They have admitted that their conduct was the cause of the collision between the vehicles driven by the plaintiffs, Jill [Mondelli] and Eileen [Couillard], and the cab driver. There no longer exists an issue with regard to fault.

\* \* \*

Now while the defendants have admitted liability, they have admitted fault, this is what they say in their answer \* \* \*."

A side bar was held immediately after the above comments when plaintiff Couillard began to weep. Subsequently, during plaintiffs' counsel's continuation of his opening statement, defendants objected to his additional comments concerning the scene of the accident and the collision, which they asserted pertained to liability and not to the severity of the impact of the collision which plaintiffs' counsel argued. Another side bar was held and, after plaintiffs' counsel had resumed his opening statement, the court, upon defendants' renewed objection, specifically explained to the jury that how and why the accident happened was not at issue, it was sustaining defendants' objections to any of plaintiffs' counsel's comments pertaining thereto, and that plaintiffs were limited to commenting only on evidence establishing the severity of the impact of the collision. Clearly, as plaintiffs' counsel argued to the court during the side bar, his comments were directed to describing the severity of the impact of the collision, and the trial court, by immediately sus-

taining defendants' objections and through its instructions to the jury, cured any potential prejudice to defendants. See *Carlasare v. Wilhelmi* (1985), 134 Ill. App. 3d 1.

We also briefly observe that the cases relied on by defendants are factually distinguishable from the case before us. In *Di Maso v. Wieboldt Stores, Inc.* (1976), 37 Ill. App. 3d 966, a strict products liability action, counsel repeatedly raised inferences that the plaintiff and his parents were guilty of improper and *negligent* conduct causing the plaintiff's injuries, which was an extraneous issue to the plaintiff's theory of recovery. In *Gillson v. Gulf, Mobile & Ohio R.R. Co.* (1969), 42 Ill. 2d 193, counsel, in his opening statement, referred to, discussed, and read from five documents which, when offered into evidence were held to be inadmissible. In both cases the plaintiffs alleged that counsel acted in bad faith, knowing that contributory negligence was not an issue (*Di Maso*, 37 Ill. App. 3d 966) and that the documents were inadmissible as had been discussed in a pretrial conference (*Gillson*, 42 Ill. 2d 193). In the present case we find no such intention, as discussed above.

■ Defendants next contend that plaintiffs' weeping twice during their counsel's opening statement and once at trial improperly resulted in playing upon the sympathies of the jury to cause the award of excessive damages to their prejudice. Specifically, the record discloses that plaintiff Couillard began to weep shortly after her counsel finished introducing the plaintiffs and explaining that defendants in their answer had admitted liability for the plaintiffs' injuries. After a side bar, during which the court denied defendants' motion for a mistrial and directed plaintiffs' counsel to instruct his clients to try to control their emotions, plaintiff's counsel resumed his opening statement. His statement was again interrupted and another side bar held relative to counsel's commenting on defendants' liability. Upon resumption of his statement, plaintiff Mondelli began to weep immediately after his comment that her and her sister's injuries were permanent. Another side bar was held and the court denied defendants' second motion for a mistrial. At that time, plaintiffs' counsel offered to remove his clients from hearing the remainder of his opening statement and to remove them from all further proceedings except for their testimony and closing argument, which was subsequently done. The last incident occurred the next day when Couillard, who was on the witness stand, began to weep while showing a brace she was wearing to the jury at the request of her counsel. Another side bar was held and defendants' third motion for mistrial was denied, the court finding that plaintiff's weeping was not planned and that she was apparently high-strung and

was doing her best to keep her composure.

Defendants' "argument" on this issue, like the previous one, is limited. They merely state in support thereof that "[a] new trial was granted by the appellate court in *Stephans v. Chicago Transit Authority*, 28 Ill. App. 2d 229, 171 N.E.2d 229 (1st Dist. 1960), in which the appellate court stated: 'We are of the opinion that the emotional outbursts and weeping of plaintiff and his wife while testifying prejudiced the defendant.' " Defendants do, however, in their reply brief, distinguish the cases relied on by plaintiffs in support of a contrary result. Specifically, they contend that those cases are inapplicable because they involved an isolated emotional incident (see *Chicago & Erie R.R. Co. v. Meech* (1896), 163 Ill. 305; *German v. Illinois Power Co.* (1983), 115 Ill. App. 3d 977; *Bauer v. Timucci* (1975), 33 Ill. App. 3d 1051; *Blachek v. City Ice & Fuel Co.* (1941), 311 Ill. App. 1), rather than the three repeated "weeping" incidents in the present case.

We do not believe that the number of weeping incidents distinguishes the cases relied on by plaintiffs. We first note that in *Stephans v. Chicago Transit Authority* (1960), 28 Ill. App. 2d 229, there are no details concerning the nature and the number of occasions of the plaintiff's and his wife's "emotional outbursts" and that the trial court was reversed not only because of the emotional outbursts but also because of cumulative errors such as the unsatisfactory testimony relative to plaintiff's injuries and the fact of the trial court's remittitur of the jury's verdict. On the other hand, as stated in *Bauer v. Timucci* (1975), 33 Ill. App. 3d 1051, 1057-58, relying on *Chicago & Erie R.R. Co. v. Meech* (1896), 163 Ill. 305, 317, this court has more recently addressed the issue of emotional outbursts at trial and their effect as follows:

> "Focusing on the specific matter of emotional outbursts by a party during a jury trial as a ground for a post-trial motion for a new trial, we note that Illinois reviewing courts have often sustained the *denial* of a new trial on that ground and, in doing so, have had occasion to discuss the legal sufficiency of that ground as a basis for the exercise of judicial discretion in *granting* a new trial on that ground. [Emphasis in original.] [Citations.] While the *Meech* case is old, it is the only Illinois Supreme Court opinion which we have found on the specific issue. We note that the opinion states that, unless the *'dramatic occurrence' is intentional or is the result of an improper motive, '[t]he fact that a plaintiff [or defendant, or witness, or any other person,] suddenly swoons or faints, or gives vent to hysterical exclamations, or breaks down with hysteria, does not call for the granting of a new trial.'* " (Emphasis added.)

In *Meech* the plaintiff's emotional outburst was described as follows: "[T]he plaintiff became hysterical, broke out crying and uttered a cry of distress, and was carried out of the court room." (*Meech*, 163 Ill. at 317.) Immediately at the same time his wife exclaimed, "You are killing my husband—you will be responsible for the death of my husband." (163 Ill. at 317.) Thereafter, a witness who was on the stand began to cry and was temporarily excused.

In light of the foregoing, we observe that apparently the *Meech* court was unconcerned about the number of incidents or the status of the persons responsible for the emotional outbursts. Clearly that court's focus was on whether the outbursts were *intentional or the result of an improper motive.*

Certainly the emotional incidents in the instant case were not as dramatic as those in *Meech*; plaintiffs describe their weeping as "brief," with the trial resuming after a side bar, and the record does not indicate otherwise. After the second incident, plaintiffs' counsel offered to and did remove his clients from the courtroom during the remainder of his opening statement, and they were only present during their testimony and at his closing argument. Moreover, it is well settled that the grant or denial of a new trial rests within the sound discretion of the trial court and absent an abuse of that discretion a reviewing court will not interfere. (*Gainer v. Bates* (1973), 14 Ill. App. 3d 297.) The trial court was apparently of the opinion that plaintiffs' weeping on the three occasions was not intentional or the result of an improper motive, and we see no reason to disturb its determination.

Defendants further argue that they were prejudiced because plaintiff Couillard introduced the subject of their insurance. In support thereof, they cite to *Bargman v. Economics Laboratory, Inc.* (1986), 144 Ill. App. 3d 24, which held that "reference to the fact that a defendant is protected by insurance or some other indemnity agreement has been held reversible error in a number of cases." The complained-of comment occurred during plaintiffs' counsel's direct examination of Couillard, *i.e.*:

"Q. Have you seen any other doctors?

A. I saw Dr. Milgram.

Q. Who is Dr. Milgram?

A. I was sent by the cab company insurance over there for him to examine me."

Contrary to defendants' suggestion that the interjection of the subject of insurance by a party is *per se* grounds for a mistrial, it is well settled that "[g]enerally, where prejudicial error has been declared [because of the mention of the subject of insurance] it is found to have

been due to some misconduct or improper remarks or questions of counsel, oft-times repeated, and calculated to influence or prejudice the jury." (*Williams v. Consumers Co.* (1933), 352 Ill. 51, 55; see also *McCarthy v. Spring Valley Coal Co.* (1908), 232 Ill. 473; *Clark v. Hasselquist* (1940), 304 Ill. App. 41; *Carlson v. Healey* (1966), 69 Ill. App. 2d 236.) A mistrial is not appropriate where the subject of insurance is introduced by an isolated, inadvertent or unresponsive reference by someone other than a plaintiff's counsel with no apparent intent to prejudice the defendant. (*Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, citing *Williams v. Consumers Co.* (1933), 352 Ill. 51.) Accordingly, defendants' attempted distinction that the cases cited by plaintiffs, which have followed this rule, are inapplicable (see *Williams v. Consumers Co.* (1933), 352 Ill. 51; *Burgdorff v. International Business Machines Corp.* (1979), 74 Ill. App. 3d 158; *Sphatt v. Tulley* (1962), 38 Ill. App. 2d 229) because the comments were made by nonparties is without merit. The only issue to be resolved is whether Couillard's comment was elicited by her counsel with an intent or design to influence or prejudice the jury or whether Couillard volunteered the remark for the same purpose. Illinois courts have recognized that with the passing of years and the almost universal prevalence of automobile liability insurance, an increasing judicial tolerance towards references to insurance has occurred. Where a finding of liability has a complete basis in the evidence and the damage award is reasonable, the courts will conclude that the jury was not prejudiced by a remark concerning the subject of insurance. (*Kitsch v. Goode* (1977), 48 Ill. App. 3d 260; see also *Sheley v. Guy* (1976), 63 Ill. 2d 544.) As one leading commentator has stated, "it seems likely today that in nearly all cases the jury will either be informed of the fact of insurance or will consciously assume that the defendant is so protected." *Kitsch*, 48 Ill. App. 3d at 266, quoting E. Cleary, McCormick on Evidence §201, at 481 (2d ed. 1972).

In the instant case, there is no indication that plaintiffs' counsel intended to elicit the comment from Couillard with the intent to influence the jury or that Couillard volunteered the comment for the same purpose. Realistically, considering common knowledge of the size of Checker Taxi Company's organization, any lay person would be aware that it has insurance protection and, therefore, no reason exists for any plaintiff's attorney to attempt to introduce the subject at the risk of a mistrial. Moreover, Couillard's response was an isolated one, and her counsel did not elicit her answer or any repetition of it. With respect to Couillard, through the course of her treatments she saw more than one doctor and she apparently merely associated Dr. Milgram's

name with the defendants' insurance carrier on the basis of her introduction of him to her when she was required to undergo an examination by him. Accordingly, we find the complained-of remark by Couillard was an isolated, inadvertent or unresponsive one.

We further observe that defendants cannot complain of prejudice where their own witness subsequently commented on the subject of insurance. Defendants' investigator, James Kuzynowski, testified, upon defendants' counsel's examination of him, as follows:

"Q. Is there something that would aid you in your recollection?

A. Possibly. There's a report that would have been made to the *insurance company* from Ron Russell and Association.

\* \* \*

Q. Mr. Kuzynowski, let's start out by asking you, is there anything you recall as to what your assignment was in this particular situation?

A. In reference to this case, I was assigned to do a surveillance on an Eileen Couillard, in reference to an *insurance claim* resulting from injury." (Emphasis added.)

A party cannot complain of the admission of evidence offered by one party where practically the same evidence is afterward introduced by the party so complaining. (*Forest Preserve District v. South Holland Trust & Savings Bank* (1976), 38 Ill. App. 3d 873.) Accordingly, since liability was admitted by defendants and the damages award is reasonable, as discussed below, clearly defendants were not prejudiced by Couillard's remark on the subject of insurance.

Defendants further argue that the "improper" testimony and argument suggesting that defendants had deprived plaintiff Couillard of her ability to bear children, where there was no medical evidence concerning her ability to engage in sexual intercourse or to bear children, "was inflammatory and undoubtedly contributed to the inflated and excessive damage award herein." In support thereof, defendants rely on *Bernardoni v. Johnson* (1975), 28 Ill. App. 3d 726, where a new trial on damages was granted because, although the plaintiff was pregnant at the time of the automobile accident at issue, there was no evidence of its adverse effect on the plaintiff's pregnancy and the trial court relied heavily on elements of pain and suffering in determining damages based on the plaintiff's improper testimony.

Plaintiffs contend that they did not present any "evidence or argument that Eileen [Couillard] could no longer have children as a result of defendants' conduct," but rather that the evidence was that her child-bearing plans were postponed and that she would have difficulty

with her pregnancy.

Defendants have again neglected to cite to the record concerning this issue. They have included excerpts of testimony on this issue, however, in their statement of facts, *i.e.*:

"A. I went to Lincoln Park Orthopedic Center for an opinion, and that was—.

Q. When did you go there?

A. That was in 1987. That was early '87.

Q. Why did you go there?

A. Well, because Dr. Stamelos had indicated that it would be very hard for me to have a child because—.

MR. GOFFEN [Defendants' counsel]: Objection, Your Honor.

THE WITNESS: —because of my condition.

THE COURT: I'll allow the testimony. It's not a conversation with the doctor, but it is a reason to explain the actions of this witness subsequent to that conversation.

MR. GOFFEN: Then I think it may be a foundation. She may be giving medical or expert type testimony. She's giving an opinion of a doctor, Your Honor.

THE COURT: No. If she's saying that the doctor indicated that it may be difficult to become pregnant or things like that, I'll allow that for the nature of the conversation, not for the accuracy or truth of the conversation but for the nature of the conversation to establish the rationale for the action of the witness subsequent thereto. You may continue.

BY MR. SCOTT [Plaintiffs' counsel]:

Q. Where did you go for this opinion?

A. I went to the Orthopedic Center. It's on Lincoln Avenue in Chicago.

\* \* \*

Q. And what did they do for you there?

A. The doctor examined me and read my x-rays. I brought x-rays for him to see in order to get his opinion, and he said the same thing Dr. Stamelos said.

MR. GOFFEN: Objection, Your Honor.

THE COURT: I will not allow testimony relative to the diagnosis, but I don't know what she's going to answer. So let me hear the answer. If the answer is diagnostic in nature, then I'll strike it. You may continue.

THE WITNESS: The doctor said that it would be very difficult for me to carry a pregnancy the entire nine months without being bedridden for the last three.

MR. GOFFEN: I would renew my objection, Your Honor.

THE COURT: I have to sustain that objection, and the jury is instructed to disregard it.

BY MR. SCOTT:

Q. Was this doctor's opinion any different than Dr. Stamelos' opinion?

\* \* \*

THE WITNESS: Yes, it was the same."

Couillard's husband also was examined on this issue and the following colloquy occurred:

"Q. How long have you been married?

A. Going on 14 years.

Q. Do you have any children?

\* \* \*

THE WITNESS: No, we don't.

\* \* \*

Q. Has the collision in this case had any effect on your marriage to Eileen?

MR. GOFFEN: Objection, Your Honor.

THE COURT: Now even though there is no claim for loss of consortium, the restriction on activities can be testified to.

THE WITNESS: Yes, it has."

Mr. Couillard went on to testify that he and plaintiff did not have any children because they had decided to wait until they were more financially secure. Mr. Couillard then testified:

"A. In February of 1980 we did buy a house, and we were in the process of saving money for furniture and for additional expenses that a pregnancy and a child would bring. And then in September of 1981 Eileen was involved in an accident, *and that caused us to postpone our plans on her getting pregnant.*

\* \* \*

Q. Now, has you sexual relationship been affected since the collision?

\* \* \*

A. Yes.

Q. And what has occurred?

A. We have less contact and less intercourse." (Emphasis added.)

In light of the foregoing, we agree with plaintiffs that there simply was no improper evidence presented concerning Couillard's inability to bear children. Although she suggested there was, the trial court immediately sustained an objection relative thereto after previ-

ously informing the jury that any testimony of a diagnostic nature was improper, thereby curing any prejudice to defendants. (See *Carlasare v. Wilhelmi* (1985), 134 Ill. App. 3d 1.) In addition, nowhere did Couillard state that her plan to bear children was on "permanent hold," as defendants contend. That phrase only appears in plaintiffs' appellate brief, not in the record. We further observe that Couillard's husband testified that plans to have children were "postponed" after Eileen's accident. Clearly, no medical evidence was improperly proffered by Eileen or her husband.

■■ Defendants' last two assignments of error are that plaintiffs continually volunteered statements, which were unrelated to questions posed, and members of plaintiffs' families were permitted to testify to alleged effects of the accident which plaintiffs themselves did not claim. Defendants have simply failed to present argument and citation to authority on these points, and they are therefore waived. See *Flynn v. Vancil* (1968), 41 Ill. 2d 236.

In light of the foregoing, we find that the errors claimed by defendants did not singly or cumulatively prejudice them or deny them a fair trial. The granting of a motion for a new trial is within the sound discretion of the trial court and, absent a clear abuse of discretion, its decision will not be disturbed. (*Cadral Corp. v. Solomon, Cordwell, Buenz & Associates, Inc.* (1986), 147 Ill. App. 3d 466.) We find no abuse of discretion.

Defendants' last arguments concern the damages awarded both plaintiffs. They contend that the awards of $333,256 to Mondelli and $1,162,500 to Couillard in compensatory damages were "excessive and beyond the limit of fair and reasonable compensation for the injury proven," thus demonstrating passion or prejudice or misapprehension on the part of the jury in fixing plaintiffs' damages.

■■ In *Lau v. West Towns Bus Co.* (1959), 16 Ill. 2d 442, 452-53, where a damages award to the plaintiff of $75,000 was upheld as nonexcessive for a fractured femur injury resulting from an automobile accident, our supreme court announced the standard for review of verdicts challenged as excessive:

> "[I]t has long been the law in Illinois that the amount of a verdict is largely within the discretion of the jury. [Citations.]
>
> *** [W]e cannot limit compensable damage for pain and suffering to a set percentage of medical, hospital and kindred expenses. Costly surgery may result in complete recovery for one person, while the total of the foregoing expenses incurred by a multiple amputee may be small. Each verdict for a personal injury must be examined in the light of the particular injury in-

volved, with humble deference to the discretion of the jury in making its determination and to the ruling of the trial judge on the post-trial motions. [Citation.]

We are not unmindful of our obligation to carefully scrutinize the record to determine whether the amount of the verdict is so large as to indicate passion and prejudice. \*\*\* [W]e conclude from the evidence that although the verdict may well be in excess of the amount which the judges of this court would have allowed if they had heard the evidence and made the original determination, yet we do not believe that it is so excessive as to show passion or prejudice."

We further observe that whether an award of damages falls within the necessarily flexible limits of fair and reasonable compensation or is so large as to shock the judicial conscience (see *Northern Trust Co. v. County of Cook* (1985), 135 Ill. App. 3d 329) must be determined from consideration of the permanency and extent of the injury, possible future deterioration, medical expenses, and restrictions on daily activity because of the injury (see *Mathieu v. Venture Stores, Inc.* (1986), 144 Ill. App. 3d 783).

With respect to the $333,256 awarded to Mondelli, defendants contend the amount is excessive because: (1) the award for past lost earnings in the amount of $10,000 was 40 times the proven lost earnings ($250 per year x 40 = $10,000); (2) there was no evidence that Mondelli would suffer any future loss of earnings, but $22,500 was awarded; (3) the award for future medical expenses in the amount of $42,300 was at least four times greater than could be sustained by the proofs ($310 per year x 40 = $12,400); (4) the evidence demonstrated that Mondelli's physical problems were caused in part by a subsequent injury for which defendants were not responsible; and (5) the total damages award was nearly 40 times the proven special damages ($9,000 x 40 = $360,000). Defendants further assert that the award of $250,000 for disability, pain and suffering was based upon the foregoing "inflated and speculative figures for the items of quantifiable damages, or 3/4 of the total award." Defendants contend that this award is especially excessive in light of case law from Illinois and other jurisdictions. See *House v. Stocker* (1975), 34 Ill. App. 3d 740; *Hedrich v. Borden Co.* (1968), 100 Ill. App. 2d 237; *Stankowitz v. Goldblatt Brothers, Inc.* (1963), 43 Ill. App. 2d 173; *Gumbs v. Pueblo International, Inc.* (3d Cir. 1987), 823 F.2d 768; *Bonner v. United States* (E.D. La. 1972), 339 F. Supp. 640; *Coffil v. New Orleans Public Service, Inc.* (La. App. 1984), 453 So. 2d 1226; *Cardwell v. Jefferson Rentals Division of J-R Equipment Corp. Assurance Co.* (La. App. 1979), 379 So. 2d 255;

*Stratton v. Webb* (Miss. 1987), 513 So. 2d 587; *MFC Services v. Lott* (Miss. 1975), 323 So. 2d 81.

Plaintiff Mondelli contends that the damages award is not excessive in light of the fact that she, who, prior to the accident, was a healthy, active 34-year-old woman, "is now forever unhealthy, suffering substantial and constant pain, severe limitations and ongoing expense and financial loss for the rest of her life." She does not address the specific damages award, but instead refers to the record concerning her medical expert's testimony and the limiting effect her injury has had on her personal and professional life. Specifically, Dr. Spiros Stamelos testified that his initial examination of Mondelli found her to be exhibiting pain, spasms, distress, abrasions, contusions, sprains, and in general, "shook up." She had pain in her head, left knee, left arm, dorsal spine, left hip and left thigh. In January 1982, Dr. Stamelos discovered that Mondelli had upper lumbar pain and lower dorsal spine pain. She was treated with ice and indocin, a nonsteroidal, anti-inflammatory prescription medication. As a result of continued pain, Dr. Stamelos prescribed an orgesic forte and gave Mondelli an injection of steroids in the dorsal and lumbar spine area. These injections were administered on approximately 12 occasions from December 1982 to May 1985. Dr. Stamelos diagnosed Mondelli as a chronic pain syndrome patient who also suffers from morning stiffness and pain due to the change in climate. Mondelli is required to wear a TENS unit, which uses electrical currents to diminish pain. The unit affords some relief but has not changed her condition. X rays taken in March 1986 showed the Mondelli's intervertebral discs at C5-C6 and C-6 to C-7 have not only narrowed but show some osteophyte and some impingement, and that she lacked the lordotic curve of the neck.

During trial, Dr. Stamelos examined Mondelli and stated that her pain occurs with changes of weather, activity and work. X rays taken during trial revealed several abnormalities in the vertebrae in Mondelli's neck from C-1 to C-7. Some of the vertebrae were touching and allowed very little room or tolerance for the discs. Dr. Stamelos compared the X rays of March 1986 with those taken during the trial and concluded that Mondelli's condition is deteriorating and is progressive. Mondelli's condition has been diagnosed as "post-traumatic fibrositis, myofibrositis, chronic pain syndrome." Dr. Stamelos stated that Mondelli's most recent complaints have become more severe and pronounced, which means that her condition is maturing and becoming more evident.

Dr. Stamelos further testified that Mondelli will need future medical care for both her back and neck, which will include doctors' visits,

injections and physical therapy. Based upon Mondelli's X rays and the degree of degeneration, Dr. Stamelos stated that there is no question that as Mondelli gets older and her aging process comes into play, her symptoms will be increased.

Mondelli's personal and professional life have also been severely limited as a result of the collision. Although Mondelli owns her own beauty shop, she works as a beautician, but is no longer able to work five days a week; instead, she is limited to three days a week and occasionally four days during the holidays. As a result, she loses 15 to 20 customers a week. She now avoids expressway driving, will not drive by herself, and asks others to drive her whenever she can. She used to go to Benton Harbor, Michigan, every weekend with her family, but since the collision she has made the trip on only two occasions because she is unable to sit for the long drive. Mondelli can no longer engage in her previous activities with her daughter, such as tap and break dancing, roller and ice skating, bowling, and trips to Great America and the zoo.

Notwithstanding what defendants argue are an excessive award of damages to Mondelli for medical charges past and future, and past and future earnings lost, we cannot say that the total damages award to her "shocks the judicial conscience" in light of her permanent disability and the degenerative nature of her injury accompanied by her future pain and suffering. See *Buczyna v. Cuomo & Son Cartage Co.* (1986), 146 Ill. App. 3d 404, *appeal denied* (1986), 113 Ill. 2d 558 (a jury verdict may only be reversed as excessive if it is so large as to shock the judicial conscience).

With respect to plaintiff Couillard, defendants make a similar assertion that the damages award in the amount of $1,162,500 is excessive based on the specific elements of damages and as demonstrated by the total award. Defendants point out as follows: (1) that at the time of the accident Couillard, a 28-year-old secretary who had been earning $330 per week and at the time of trial $425, claimed $16,400 in past earnings lost and the jury subsequently awarded her $29,000, almost double the amount of the proofs; (2) that although she claimed future loss of earnings, which included the loss of one day a month to visit the doctor, and the jury awarded her $212,500 for future losses, there was no evidence that she would be docked for taking six or seven "sick" or "personal" days a year; (3) that although her medical expenses for the past three years had averaged $250 per year and she had a life expectancy of 46.2 years, the jury, instead of awarding her $11,500, awarded her $125,000 for future medical expenses, which included the cost of a third surgical procedure that presently would only cost $25,000; (4) the

award for past and future pain and suffering, as well as disability and disfigurement amounted to $775,000, which was excessive; (5) and the total award was more than 30 times the proven special damages and therefore excessive.

■■■ We similarly hold that the damages award to plaintiff Couillard is not excessive. At the time of the collision, Couillard was an active, healthy, 28-year-old woman. Following the collision, she suffered from pain in her back and down her leg, soreness, fatigue, periorvital swelling, ecchymosis, contusions and abrasions, and stiffness in her neck. From September 1982 until November 1982 she receive physical therapy, medication, rest and supportive care. Although all of her symptoms improved, she continued to experience lower back and leg pain; she was suffering from "referred pain" or sciatica. Medical testimony indicated that in November 1982 Couillard was suffering from a pathology at the L5-S1 and L4-L5 discs; she had a herniated disc at L5-S1 and a ruptured disc at L4-L5. Couillard subsequently underwent a chemonucleolysis procedure in December 1983. Thereafter, Dr. Stamelos prescribed a back brace or corset for support of Couillard's back and she received cortizone injections. After a rehabilitation period for approximately one week, during which Couillard could not sit, bend, exercise, work, or drive a car, it was determined that the chemonucleolysis surgery was not successful.

In August 1984, a CAT scan showed that Couillard had a herniated disc at L5-S1 despite the previous surgery and a herniation at L4-L5. She continued to have sciatica pain, which traveled from her back down her leg. In March 1985, after her condition had become so disruptive of her work and personal life, Couillard underwent a laminectomy operation in the area of her L5-S1 discs. Her mobility was restricted and she was required to take muscle relaxants, pain pills and sleeping pills. In January 1988, during trial, Dr. Stamelos took additional X rays of Couillard. They showed sclerosis, a decompressed laminar opening and an extremely narrow disc space at L5-S1. The examination showed a scar from the laminectomy and limited range of motion of her spine and low back pain. Dr. Stamelos subsequently diagnosed Couillard's present condition as progressive sclerosis and instability of her L5-S1 disc space. Stamelos also stated that Couillard's condition was caused by the accident at issue, that Couillard would need medical treatment of her back for the rest of her life, that her condition was worsening and that she would need orthopedic and medical treatment for her entire life for low back pain. He further stated that the degeneration of bone and disc in Couillard's back was that of a person 60 years of age. He also testified that the probability of Couil-

lard having a surgical procedure such as a fusion would be 55% to 60%, that the fusion operation would cost approximately $25,000, and that Couillard would lose a certain percentage of motion in her back. Couillard's medical bills to the time of trial totalled $20,844.

Couillard also testified that her personal and professional life have been severely affected. Prior to the accident, she enjoyed ice and roller skating, cross-country skiing, tennis, bike riding, weekly racketball and amusement park rides, and she was a member of the Chicago Health Club. She can no longer do any of these things because of the pain she experiences from her injury. Couillard also requires substantial rest and she cannot perform routine household duties such as cooking, dishwashing and yard maintenance. She cannot go grocery shopping alone because she cannot carry packages very well. She cannot go to a movie theater because she cannot sit long enough to see the end. Because of her hospital stays and recuperation periods, as well as the adverse affects from her medication which she is required to take constantly, she cannot spend as much time with her husband and she has less sexual contact with him. Moreover, Couillard, who was a healthy 28-year-old woman at the time of the accident, now has the back of a 60-year-old person. Any employment in the future will require that she find an employer willing to accommodate her need to be off of work at least once a month and the fact that any position she holds does not require sitting or standing for long periods of time.

We hold, as we did on this issue for Mondelli, that we cannot say that the total damages award to Couillard shocks the judicial conscience in light of the permanent nature of her disabling injury and her future pain and suffering.

Based on the foregoing, the judgment of the circuit court of Cook County is affirmed as to all issues.

Affirmed.

COCCIA, P.J., and LORENZ,* J., concur.

---

*Justice R. Eugene Pincham participated in this case prior to his resignation. Since that time Justice Francis S. Lorenz was designated the third member of the panel and has read the record and briefs and has listened to the oral argument tape.