DENNIS R. BODEN *et al.*, Plaintiffs-Appellees, v. MARCUS E. CRAW-FORD, Defendant-Appellant.

Fourth District   No. 4—89—0790

Opinion filed March 29, 1990.

Howard L. Snowden, of Snowden & Snowden, of Quincy, for appellant.

Keefe, Gorman & Brennan, of Quincy (Jerry L. Brennan, of counsel), for appellees.

JUSTICE McCULLOUGH delivered the opinion of the court:

Plaintiff Dennis Boden, formerly a police officer, filed a personal injury action against defendant Marcus Crawford, claiming defendant caused plaintiff's back injuries. Plaintiff was injured while on duty investigating a child-abuse complaint involving defendant's child. A jury found defendant liable for the injuries and awarded plaintiff $204,793.40 in damages. Defendant appeals, arguing (1) the prohibition against introducing any evidence regarding disability benefits plaintiff is receiving prejudiced the defendant and the benefits should be considered an exception to the collateral-source rule; and (2) the award for damages was excessive and was the result of passion and prejudice. We affirm.

It is first noted that with respect to plaintiff Linda L. Boden, the parties agreed that insofar as her actions are concerned, it has been resolved and she is not a party to this appeal.

Plaintiff was a police officer for the Quincy police department (department) and 36 years of age at the time of his injury on February 6, 1987. He had, before joining the police force, served two years in the Marines, and had also worked as a truck driver and heavy equipment operator. He is presently a captain in the Army Reserves.

Plaintiff testified that on February 6, he was called by the principal of a grade school to see a young man named Jerod Crawford for possible child abuse. Plaintiff decided to question the defendant, the father of the child. Plaintiff was told defendant drove a green pickup truck and would be arriving at the school soon. Defendant arrived at the grade school in his truck, and the plaintiff approached the truck. Plaintiff testified he identified himself as a police officer and asked, "Are you Marcus Crawford?" After the defendant responded, "Yes," plaintiff reached for the door handle, whereupon defendant started the truck, put it in gear, and pulled away at a high rate of speed down an alley. Plaintiff stated he was on the running boards of the truck and attempted to reach inside defendant's truck to turn off the ignition. Plaintiff testified he eventually jumped into the back of defendant's truck after deciding the truck was going too fast for him to jump off. Plaintiff stated he was tossed around in the back of the truck while defendant continued to travel at a high rate of speed while turning around corners. Plaintiff estimated defendant was traveling 30 miles

per hour in the alley, 40 to 45 miles per hour after leaving the alley and continued to speed up thereafter. Plaintiff eventually ordered defendant to stop driving by putting his fist through the rear window of the truck and pointing his weapon at defendant's head. Plaintiff admitted that at no time did defendant say or do anything to indicate that defendant knew plaintiff was in the truck.

Defendant testified he saw plaintiff approaching him, but that he heard no commands or statements. Defendant stated he has a partial hearing impairment in his left ear. Defendant stated that when he saw plaintiff coming at him on the day of the incident, he just "took off." Defendant pleaded guilty to possession of a controlled substance and reckless conduct, and was sentenced to three years' probation and fined. Defendant testified he did not know anyone was in his vehicle until a hand came through the top part of the window, and he stopped within five seconds of the hand coming through the window.

Officer Gilbert Feld testified he was patrolling the area near the school on February 6. He observed defendant's truck traveling at a high rate of speed with a man in the back holding a gun. Feld testified he saw the truck pull over and he noted the man in the back was the plaintiff. The back window of the truck was broken, and plaintiff was holding his weapon on the defendant. After defendant was arrested, a passing motorist told Feld that "baggies" had been thrown from the truck and showed the officer the location of the baggies. The parties stipulated that two plastic bags thrown from defendant's vehicle during the course of the incident contained apparently 26.6 and 27.9 grams of cocaine.

Plaintiff testified he saw the department physician, Dr. Thomas Westerhoff, on February 9, 1987, complaining of pain in the rib area and cuts and bruises on his left hand. Westerhoff gave plaintiff pain pills and muscle relaxers and ordered plaintiff to take a week off from work. Several weeks later, plaintiff saw Dr. Dalal, who ordered lower lumbar X rays and a CAT scan and directed plaintiff to begin physical therapy. Dalal told plaintiff to take several more weeks off from work. Plaintiff continued to work as a juvenile officer for the department on light duty until April 1988, when he was told to take a leave of absence. At the time of trial, plaintiff was no longer a police officer.

Dr. Westerhoff, the department physician, board certified in internal medicine with 23 years of experience, testified that he examined plaintiff on February 10, 1987, and found muscle spasms in plaintiff's back. Westerhoff stated he prescribed pain pills and muscle relaxers for plaintiff. Westerhoff saw plaintiff again on July 1, 1987, when plaintiff reported he continued to experience back pain. Westerhoff ob-

served plaintiff stood with a lift to the left. He advised plaintiff to continue light-duty work for the department. Westerhoff continued to treat plaintiff through 1988 and, in April 1988, advised the department plaintiff would never be able to resume the normal duties of a patrolman. Westerhoff stated plaintiff's back problems were permanent and related to the incident on February 6, 1987. Westerhoff testified an X ray taken of plaintiff's lower back showed bulging in the lower spine, between the fourth and fifth lumbar discs. On cross-examination, Westerhoff admitted that there was no way to tell when the bulging of the discs occurred, not having any information on the condition of plaintiff's back before the accident. He testified the plaintiff could "technically" not be liaison officer for the department because no police officer is allowed on the department unless capable of combat duty.

At the request of the department, plaintiff was examined by several other physicians, each of whom testified at trial. Dr. del Castillo, a specialist in neurosurgery, testified he examined plaintiff on August 23, 1988. He stated he saw signs of muscle spasm, but the sciatic nerve was not damaged. He found no atrophy in plaintiff's thighs or calves, but some weakness in plaintiff's left side. He reviewed a magnetic resonance image (MRI) test taken of plaintiff's back in 1987, which showed degeneration of cartilage between the fourth and fifth lumbar discs. He testified that back pain may not be experienced immediately after an accident. He reviewed the CAT scan which was taken a few days after the accident and testified it showed bulging between the fourth and fifth lumbar discs. He further testified that the degeneration takes a long period of time, but bulging can occur at a point of trauma. Dr. del Castillo found a causal relationship between the incident on February 6 and plaintiff's back problems, which he stated were permanent. Dr. del Castillo stated the repeated twisting, turning, and tumbling plaintiff was subjected to in the defendant's truck weakened the discs and caused the bulging between the discs to develop. He stated surgery would alleviate the constant pain plaintiff suffers. Dr. del Castillo testified plaintiff's prior activities would definitely have a bearing on the degeneration of the intervertebral disc at any level and that 95% of all ruptured discs occur at the fourth and fifth discs and lower.

Dr. Gwaltney, a specialist in orthopedic surgery, testified that he examined the plaintiff on May 6, 1988. He testified plaintiff showed no atrophy on circumferential measurements and no evidence of sensory disturbance. Gwaltney testified the MRI report showed disc disease at the fourth and fifth lumbar interspace. He further testified surgery might relieve pain, but would not strengthen plaintiff's back.

On cross-examination, Gwaltney admitted he did not take a history from plaintiff but read the emergency room report taken on the day of injury. He further testified the emergency report indicated plaintiff had no complaints in his lower extremities. Gwaltney also identified a CAT scan taken on February 18, 1987, of plaintiff's back, which also showed bulging between the fourth and fifth lumbar discs. Gwaltney testified there was some degeneration between the fourth and fifth discs at the time of the accident on February 6.

Dr. Dennis Abernathie, an orthopedic specialist, testified in a deposition for the defendant that he examined plaintiff on August 18, 1987. Abernathie concluded plaintiff sprained his lumbosacral joint. Abernathie reviewed the MRI report taken in December 1987 and stated it did not change his diagnosis of plaintiff's injury. Abernathie further stated that disc degeneration must start at least six months before a test to show up on the test. Abernathie stated that the plaintiff could continue his activities without restriction and danger to himself but might suffer some discomfort.

John LaTour, deputy chief of operations for the department, testified that he had known the plaintiff since 1981 and that plaintiff served under his command. LaTour testified that plaintiff was a good police officer who enjoyed his job and was one of the officers chosen for the elite SWAT unit. LaTour stated that there were no jobs in the department which were available to someone with a disability. LaTour testified the normal retirement age for police officers is 65. On April 21, 1988, the LaTour told plaintiff he could not work anymore as a police officer for the reason that a report had been received from the department's doctor stating plaintiff was disabled. The plaintiff's last day of employment was July 1, 1988. On cross-examination, LaTour testified his action was subject to appeal to the Board of Fire and Police Commissioners, but plaintiff did not appeal.

Brenda Williams, a police officer in the juvenile department, testified plaintiff was a reliable partner and good with kids. Williams further testified she remembered plaintiff's last day. She stated plaintiff had a meeting with his supervisor and, when he came out, his face was gray. Williams and plaintiff then went to a restaurant and plaintiff started crying and was very upset. Plaintiff ordered a milkshake but could not hold it because his hands were shaking.

Plaintiff's wife and daughter testified regarding plaintiff's normal activities with his family prior to the February 6 incident. Both stated plaintiff was very athletic and engaged in many sporting activities. Both also stated plaintiff never complained of back pain before February 6 and since then did not participate in many activities because of

the pain in his lower back.

Plaintiff testified he was paid $27,500 in 1986 as a police officer and since the injury had been employed part time in only two minimum-wage jobs.

Prior to trial, plaintiff filed a motion *in limine* to prohibit defendant from asking any questions regarding the disability benefits plaintiff is receiving from the department as a result of his disability leave. The trial court granted the motion, stating evidence regarding disability benefits was barred by the collateral-source rule.

Defendant argues the trial court erred in granting the motion *in limine* based on the collateral-source rule. Defendant contends that the fact that the benefits are not gratuitous and plaintiff does not have to pay the benefits back to the department distinguishes this case from other cases discussing the collateral-source rule. Defendant maintains the evidence left the jury with the impression plaintiff was discharged by the department without any pay or benefits and against his will when in fact plaintiff asked for his disability benefits and was receiving more than 50% of his 1986 salary at the time of trial. Defendant also maintains the jury's damage award was excessive and the determination of plaintiff's 5% contributory negligence was against the manifest weight of the evidence. Defendant asks for a remittitur of $100,000.

■ Illinois recognizes the collateral-source rule, under which the amount of damages for a plaintiff in a civil action is not decreased by the amount of benefits received by the plaintiff injured-party from a source wholly independent and collateral to the wrongdoer. (*Peterson v. Lou Bachrodt Chevrolet Co.* (1978), 61 Ill. App. 3d 898, 906-07, 378 N.E.2d 618, 625.) The entire theory behind this rule is to keep the jury from learning anything about collateral income which could influence the decision of the jury. *Wolfe v. Whipple* (1969), 112 Ill. App. 2d 255, 267, 251 N.E.2d 77, 82.

■ Defendant, by his argument, admits that evidence plaintiff is receiving disability benefits from the department would have influenced the jury to award a lesser amount. Allowance of any evidence regarding the benefits would render this long-standing rule meaningless. Further, we reject defendant's attempt to distinguish disability benefits an employer may be required to pay an injured employee from the gratuitous income received in *Wolfe, Peterson,* and *Fear v. Smith* (1989), 184 Ill. App. 3d 51, 539 N.E.2d 1297. The fact remains the income plaintiff receives from the department is collateral to defendant. Therefore, we find it falls squarely within the collateral-source rule and the trial court correctly barred any evidence on these benefits.

■ Next, defendant contends the damage award is excessive, the

result of passion and prejudice, and unsupported by the evidence. It is generally stated that the amount of damages to be awarded is within the jury's sound discretion. (*Stamat v. Merry* (1979), 78 Ill. App. 3d 445, 397 N.E.2d 141.) A reviewing court should not reduce or overturn a verdict unless it is shown to be erroneous or the result of passion or prejudice, or where it clearly appears from the uncontroverted evidence that the amount of the verdict bears no reasonable relationship to the loss suffered by the plaintiff. *Rapp v. Kennedy* (1968), 101 Ill. App. 2d 82, 86, 242 N.E.2d 11, 14.

The jury awarded plaintiff a total of $215,572 in damages as follows: $110,000 disability; $5,000 past pain and suffering; $20,000 future pain and suffering; $5,572 past medical expenses; $25,000 past loss of earnings; and $50,000 future loss of earnings. The award was reduced 5% to $204,793.40. Defendant suggests the finding that plaintiff was only 5% negligent evidences the prejudice of the jury. Specifically, defendant points out plaintiff elected to take the risk of jumping into the back of defendant's truck when another alternative was available. Defendant also contends the amount of damages awarded for disability represents a finding based on loss of employment, not based on the back injury plaintiff suffered. Defendant also states this case is not unlike *House v. Stocker* (1975), 34 Ill. App. 3d 740, 340 N.E.2d 563, where a jury verdict of $157,500 for a back contusion in the lumbar region was found excessive and reduced to $50,000.

■ We do not agree. At trial, plaintiff testified defendant was going too fast down the alley for him to safely jump off the truck. The *House* case is distinguishable. In the case before us, three physicians concluded plaintiff suffers from a permanent back injury, not a bruise to the lower back, which caused him to lose his job as a police officer. Plaintiff also presented the testimony of a psychologist who stated that in the future, most employers will not hire plaintiff because of his back injury. Plaintiff was a young, physically fit officer at the time of the injury, was reported to be good at his job, well liked by the community, and looking forward to a long career as a police officer. We find the jury's award of $171,000 for future pain and suffering, future lost earnings, and disability is supported by the evidence and not excessive for the possible 28 years of future employment as a police officer plaintiff could have enjoyed but for his injury.

Accordingly, the judgment for the plaintiff is affirmed.

Affirmed.

LUND and SPITZ, JJ., concur.