MARIO NATALINO, Plaintiff-Appellant and Cross-Appellee, v. JMB REALTY CORPORATION *et al.*, Defendants-Appellees and Cross-Appellants (Kelley Steel Erectors, Inc., Third-Party Plaintiff-Appellant; J.A. Jones Construction Company, Third-Party Defendant-Appellee).

First District (4th Division)   Nos. 1—93—2959, 1—93—2965, 1—93—2966 cons.

Opinion filed December 28, 1995.

Anesi, Ozmon & Rodin, Ltd., of Chicago (James J. Morici, Jr., of counsel), for appellant Mario Natalino.

D. William Porter, of Stevenson, Rusin & Friedman, Ltd., of Chicago, for appellant Kelley Steel Erectors, Inc.

Daniel F. Konicek and Michelle L. Adams, both of Connelly & Schroeder, of Geneva, for appellees JMB Realty Corporation and Inland Construction Company.

Baker & McKenzie, of Chicago (Francis D. Morrissey, Peter J. Mone, Michael A. Pollard, and Adriane W. Burkland, of counsel), for appellee J.A. Jones Construction Company.

JUSTICE THEIS delivered the opinion of the court:

This consolidated appeal arises from a $129,212 jury verdict in favor of the plaintiff, Mario Natalino, against the defendants, JMB Realty Corporation (JMB), Inland Construction Company (Inland) and Kelley Steel Erectors (Kelley), for negligence under the Structural Work Act (Ill. Rev. Stat. 1991, ch. 48, par. 59.90 *et seq.*). On appeal, the plaintiff requests a new trial on the issue of damages, charging that the verdict is inconsistent because jurors awarded him lost earnings, medical expenses and pain and suffering, but nothing for disability and disfigurement. He further contends that several trial errors served to prejudice him, thereby requiring a new trial as to damages. All defendants filed cross-appeals claiming that the Occupational Safety and Health Act of 1970 (OSHA) (29 U.S.C. § 651 *et seq.* (1988), preempts the Illinois Structural Work Act (Act), thereby precluding the plaintiff from pursuing a cause of action under the Act. JMB and Inland also argue that the verdict should be set aside because they did not willfully violate the Structural Work Act. Finally, Kelley filed a third-party appeal against the plaintiff's employer, J.A. Jones Construction Company (Jones), arguing that the trial court erroneously dismissed its complaint seeking contribution

as untimely. For the reasons which follow, we determine that the plaintiff's claims concerning the verdict and the alleged trial errors are without merit. With respect to the cross-appeal, we determine that OSHA did not preempt the Structural Work Act. Further, the jury's decision that JMB and Inland willfully violated the Act was not against the manifest weight of the evidence. Finally, we affirm the trial court's order dismissing Kelley's complaint against Jones as untimely. Therefore, we affirm the trial court's judgments in all respects.

On August 21, 1986, the plaintiff, Mario Natalino, sustained a head injury while working on a construction site when a steel clamp fell through scaffolding, striking him on the head and neck. Jones, the plaintiff's employer, had been retained by JMB, the owner of the site, as a general contractor on the project located at 900 North Michigan Avenue in Chicago. On the day of the accident, Kelley workers were erecting steel columns above the area where the plaintiff worked.

Following his injury, the plaintiff received treatment at the Northwestern Memorial Hospital (Northwestern) emergency room for a laceration on the back of his head. Emergency room records show that the plaintiff denied loss of consciousness, a headache, numbness or visual changes, and he was found neurologically normal. The plaintiff received follow-up care at Northwestern on August 23, 1986, and the emergency room report reflects no neurological complaints. On August 28, 1986, the plaintiff again returned to the emergency room for follow-up care accompanied by his son, Peter Natalino. The hospital record shows that the plaintiff experienced a headache, slight dizziness and pain on the left side of his neck. The record further shows that the emergency room physician estimated that the plaintiff would be off work for two weeks.

At trial, William Stone, a Kelley ironworker, testified that he and his crew knocked a clamp off of scaffolding where they were working. He stated that when he looked down into the excavation below, he observed the plaintiff on his hands and knees, attempting to stand up.

Charles Porter, a JMB construction manager, testified that he was physically present on the jobsite during construction and that he had visited the excavation prior to August 21, 1986. His responsibilities included ensuring that the general contractor and subcontractors met JMB's expectations.

Next, George Ecklund and John Lingevitch, both Inland superintendents, testified. They indicated that Inland superintendents were present at the construction site on the date of the plaintiff's injury.

They further stated that Inland's responsibilities included ensuring that the construction workers performed their jobs safely. Any deficiencies observed by Inland were to be reported to Charles Porter of JMB. Ecklund admitted that on August 21, 1986, he knew Jones employees were working at the below-ground excavation, as Kelley employees worked on steel construction at street level. Ecklund confirmed that the placement of Kelley and Jones workers on top of one another could result in a "very, very dangerous condition."

Two physicians also testified for the plaintiff. Dr. Jules Koveleski, a neurologist who treated the plaintiff, diagnosed him as suffering from chronic post-concussion syndrome, which he defined as a "constellation of symptoms" associated with a head injury. The plaintiff complained of dizziness, pain in the area of the injury, ringing in his ears, fatigue, difficulty sleeping and general weakness.

Initially, Dr. Koveleski prescribed Elavil, an antidepressant, for the plaintiff and eventually he prescribed a physical therapy program for him. He saw the plaintiff on three separate occasions in 1986, in December of 1989 and in March of 1993. His diagnosis of post-concussion syndrome remained the same for all visits. Dr. Koveleski believed that the plaintiff's condition was directly related to his injury on August 21, 1986, and that it disabled him from returning to work.

Dr. Koveleski agreed that patients normally recover from post-concussion syndrome in about four to six months. He further acknowledged that the plaintiff's subjective complaints formed the basis for his diagnosis. Dr. Koveleski admitted that the plaintiff informed him that he had lost consciousness after the accident, but that the emergency room report indicates the contrary.

At trial, Dr. Koveleski reviewed some of the plaintiff's medical records from Dr. Marchi, the plaintiff's family physician. Dr. Koveleski further acknowledged that Dr. Marchi's notes from the plaintiff's visit on August 29, 1986, and September 4, 1986, do not contain a reference to headaches or visual disturbances. Dr. Koveleski did not encounter any objective evidence that corroborated the plaintiff's complaints and agreed that the plaintiff was normal from an objective viewpoint.

Dr. Grimm, a neuropsychologist, also testified on the plaintiff's behalf. He diagnosed the plaintiff as suffering from post-concussion syndrome and secondary psychological difficulties such as depression and anxiety. In his opinion, the plaintiff's condition constituted a permanent disability and rendered him incapable of working in the construction industry.

Dr. Grimm acknowledged that he derived his conclusion from the plaintiff's subjective complaints. He testified that based on the

neurological tests performed, the plaintiff appeared to be more severely impaired than would be expected given his objective neurological status. He acknowledged that plaintiff gave inconsistent medical histories to different physicians. Finally, Dr. Grimm stated that one would not expect post-concussion syndrome from a scalp laceration such as the plaintiff's. However, he did not believe that the plaintiff was malingering.

At trial, the plaintiff's son, Peter Natalino, his daughter-in-law, Rita Natalino, and his wife, Lida Natalino, all testified concerning the plaintiff's physical, mental and emotional condition following the accident. They testified the plaintiff did not perform the same activities that he used to enjoy, such as gardening and spending time with his family. They further stated that his personality and relationship with the family changed for the worse.

The plaintiff testified on his own behalf, stating that he always had a good relationship with his family, even after the accident. Further, the plaintiff claimed that he no longer gardened, except for watering and weeding for a few seconds. He stated that he typically remains in his house all day long.

The record on appeal shows that the plaintiff testified in Italian using a translator. The record also shows that the plaintiff communicated with his treating physicians with the assistance of family members who served as translators. However, the plaintiff was able to speak Italian with his family physician, Dr. Marchi.

The defendant presented the testimony of Matt Mills and Robert Rader, who made surveillance videotapes of the plaintiff outside of his home on two days in the fall of 1987 and on four separate days in the fall of 1992. John Rivera testified that he made freeze-frame photographic prints from these videotapes. All witnesses stated that the videotapes and photographs accurately reflected their observations. The jury viewed all of the tapes, as well as the prints made from the tapes. The tapes depict the plaintiff performing various activities which contradict testimony given on the plaintiff's behalf.

Dr. Shenker, the defendant's expert neurologist, stated that he did not encounter any records that indicated that the plaintiff lost consciousness following the accident. He further noted that when the plaintiff's family physician, Dr. Marchi, examined the plaintiff on August 29, 1986, he found the plaintiff to be normal. Dr. Marchi did not indicate that the plaintiff's behavior changed significantly following the accident. Dr. Shenker further testified that in January of 1988, Dr. Marchi wrote that the plaintiff's ability to do work-related activity was "normal except for language barrier."

Dr. Shenker concluded that the plaintiff was a malingerer based

on the following factors: (1) the lack of objective neurological defects, (2) the inconsistent medical histories given by the plaintiff, (3) the deposition testimony of Dr. Barry Lake Fischer, the plaintiff's expert who was not called at trial, that he would not place work restrictions on the plaintiff except to prohibit climbing, and (4) his own medical examination of the plaintiff contrasted with the range of motion that he exhibited in a November 17, 1992, video that Dr. Shenker reviewed. On cross-examination, Dr. Shenker admitted that the symptoms experienced by the plaintiff are consistent with the symptoms experienced by an individual who suffers from post-concussion syndrome.

The jury awarded the plaintiff $20,000 for pain and suffering, $10,212 for medical expenses and $99,000 for lost earnings, but nothing for disability and disfigurement, future pain and suffering or future lost earnings. All parties filed appeals, which were consolidated before this court.

We first address the issues raised in the defendants' cross-appeals. First, Inland and JMB contend that the trial court erred in denying their motions for a directed verdict and a judgment notwithstanding the verdict because the plaintiff failed to demonstrate that they willfully violated the Act. The defendants maintain that nothing in the record shows that JMB or Inland was aware that Jones employees were working below Kelley employees at the time of the accident.

A willful violation of the Act occurs when one having charge of the work either knows that a dangerous condition exists or by the exercise of reasonable care could have discovered the existence of the condition. (*Simmons v. Union Electric Co.* (1984), 104 Ill. 2d 444, 473 N.E.2d 946; see also *McInerney v. Hasbrook Construction Co.* (1975), 62 Ill. 2d 93, 338 N.E.2d 868 (It is possible to infer that the defendant knew or could have known of a condition due to the presence of the defendant's superintendent on the jobsite). ) We note that a judgment notwithstanding the verdict should be entered only where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.

Here, two Inland superintendents, George Ecklund and John Lingevitch, testified that they were aware that it was dangerous to allow Kelley workers to erect steel above the excavation site where the Jones employees were working. Further, JMB received daily reports concerning the progress of the work. Any safety digressions were to be reported directly to Charles Porter, a JMB construction manager. Porter testified that he was physically present on the site throughout

the construction. Further, Lingevitch, an Inland superintendent, testified that he was present on the construction site before the plaintiff's accident to observe "what was going on with the other trades."

■ Upon reviewing the testimony of Inland, JMB and Kelley employees, we cannot say that viewing the evidence in the light most favorable to Natalino, no verdict in his favor could ever stand. Both JMB and Inland either knew or could have known of the dangerous condition at issue, namely, the plaintiff's presence below workers who were erecting steel. Therefore, we uphold the finding of liability against JMB and Inland.

■ Next, all three defendants, JMB, Inland and Kelley, raise the issue of whether OSHA (29 U.S.C. § 651 *et seq.* (1988)) preempts the Illinois Structural Work Act (Ill. Rev. Stat. 1991, ch. 48, par. 59.90 *et seq.*) and, therefore, the plaintiff's cause of action against them was improper. We resolved this issue in *Davis v. States Drywall & Painting* (1994), 268 Ill. App. 3d 704, 645 N.E.2d 304. There, we held that although the goals of both statutes may overlap at times, that fact alone will not render the Structural Work Act unenforceable where it does not interfere or conflict with OSHA. (*Davis*, 268 Ill. App. 3d at 714, 645 N.E.2d at 311; see also *Gade v. National Solid Wastes Management Association* (1992), 505 U.S. 88, 120 L. Ed. 2d 73, 112 S. Ct. 2374.) Also, because the Act provides a remedial measure for an injured party and the OSHA regulations do not, the plaintiff's cause of action is expressly preserved by OSHA's savings clause. (See 29 U.S.C. § 653(b)(4) (1988).) Consequently, we find that OSHA does not preempt a claim under the Structural Work Act, and therefore, the plaintiff's cause of action against all three defendants was properly before the trial court.

We now turn to the plaintiff's appeal challenging the trial court's denial of his post-trial motion asking the court to vacate the judgment entered on the verdict and grant a new trial on the issue of damages. The plaintiff argues that the jury verdict was inconsistent because the plaintiff received 100% of his medical expenses and lost wages through the age of 65, as well as damages for pain and suffering, but nothing for disability and disfigurement. The plaintiff also argues that the trial court ignored disability and disfigurement as a proven element of damages.

We review the trial court's decision denying a motion for a new trial according to whether the court abused its discretion. (*Beckmeyer v. Alcala* (1985), 135 Ill. App. 3d 166, 481 N.E.2d 893.) Furthermore, on a motion for a new trial, the court should weigh the evidence, set aside the verdict and order a new trial only if the verdict is contrary

to the manifest weight of the evidence. *Hastings v. Gulledge* (1995), 272 Ill. App. 3d 861, 651 N.E.2d 778.

The jury is charged with the responsibility of resolving conflicting evidence, evaluating the credibility of witnesses and deciding what weight to give to their testimony, and an appellate court should not usurp this function. (*Maple v. Gustafson* (1992), 151 Ill. 2d 445, 603 N.E.2d 508.) When evaluating the adequacy of the damages, a reviewing court must consider the record as a whole. *Hastings*, 272 Ill. App. 3d at 864, 651 N.E.2d at 781.

The plaintiff argues that *Smith v. City of Evanston* (1994), 260 Ill. App. 3d 925, 631 N.E.2d 1269, and *Martin v. Cain* (1991), 219 Ill. App. 3d 110, 578 N.E.2d 1161, support his contention that the jury award is inconsistent, thereby warranting a new trial as to damages. In both cases this court determined that the juries' failure to award damages for disability while simultaneously compensating the plaintiffs for other categories of damages resulted in an inconsistent verdict. However, the bases for our conclusions in *Martin* and *Smith* are absent from the present case. Therefore neither controls.

First, we recognize that in *Smith* this court affirmed the trial court's decision to grant the plaintiff a new trial, concluding that it did not abuse its discretion in finding the jury had misunderstood the full legal meaning of the term "disability," in rendering its verdict. We held that courts should use the phrase "loss of a normal life," rather than "disability," when instructing the jury. The term "disability" may be understood by jurors as overlapping with other categories of damages. *Smith v. City of Evanston*, 260 Ill. App. 3d at 938, 631 N.E.2d at 1279.

As in *Smith*, the standard of review by which this court evaluates the trial court's decision concerning a post-trial motion is highly relevant. As in *Smith*, we are asked to determine whether the trial court abused its discretion in ruling on a motion for a new trial as to damages.

Further, in *Martin* and cases that have followed it (see, *e.g.*, *Slavin v. Saltzman* (1994), 268 Ill. App. 3d 392, 643 N.E.2d 1383; *Sands v. Glass* (1994), 267 Ill. App. 3d 45, 640 N.E.2d 996), the plaintiffs offered uncontradicted evidence of a lifestyle change as a result of the injury caused by the tortfeasors. Such is not the case here.

■ Upon reviewing the record in its entirety, we find that issue of the plaintiff's "disability" was sharply contested throughout the proceedings and the parties presented conflicting evidence concerning the plaintiff's alleged lifestyle changes. For example, the plaintiff himself testified that his relationship with his family was as enjoy-

able after the accident as before. This testimony directly contradicted that of his family members who indicated that the familial relationship with the plaintiff had deteriorated following his injury. It is conceivable that the jury did not believe that the plaintiff experienced a lifestyle change which would warrant damages for disability. Additionally, the jury viewed videotapes of the plaintiff performing activities throughout the years before trial that contradict testimony concerning the plaintiff's range of motion. Moreover, the record is replete with examples of contradictory evidence concerning the plaintiff's lifestyle after the accident.

With respect to disfigurement, the record shows that the jury could have concluded that the plaintiff was not entitled to an award under this category of damages. The plaintiff received stitches on the back of his head. As such, the jurors may have determined that scarring was not visible or detrimental to the plaintiff. Consequently, we conclude that the trial court's denial of the plaintiff's motion for a new trial did not constitute an abuse of discretion. Furthermore, we reject the plaintiff's argument that the jury ignored a proven element of damages, as the contradictory evidence on the issue of disability permeated the trial.

The plaintiff further argues that the cumulative effect of prejudicial and erroneous rulings by the trial court deprived him of a fair trial as to damages. He first contends that the trial court erred in granting the defendant's oral motion to limit the scope of cross-examination of Mills and Rader.

■ When reviewing a trial court's decision concerning the scope of cross-examination, we must determine whether the court abused its discretion and whether the abuse materially affected the result of the trial. (*Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 558 N.E.2d 493.) In the present case, we find that the court acted well within its discretion by limiting the scope of the plaintiff's cross-examinations to the matters raised during the direct examinations of the witnesses. Likewise, we determine that the trial court acted within its discretion in admitting the properly authenticated freeze-frame photographs made by John Rivera. See *Carney v. Smith* (1992), 240 Ill. App. 3d 650, 608 N.E.2d 379.

■ Next, the plaintiff contends that a new trial as to damages is warranted because a question asked by defense counsel concerning the plaintiff's retirement and a defense witness' mention of Aetna Insurance violated the collateral source rule. First, it is well established that evidence of benefits received by a plaintiff from collateral sources independent of the tortfeasor will not serve to diminish any damages otherwise recoverable. (*Brumley v. Federal Barge Lines, Inc.* (1979),

78 Ill. App. 3d 799, 396 N.E.2d 1333.) During the cross-examination of the plaintiff the following colloquy took place:

"Q. In August of 1986 you had 16 years in the union, correct?

A. First they say maybe it was not 16 years because some I hadn't paid. Then later on the union wrote me that I had 16 credits.

Q. And with 16 credits, you retired."

The court sustained the plaintiff's objection before the questioning progressed any further. We note the plaintiff's counsel first raised retirement during the plaintiff's direct examination. Based on the record before us, we conclude that the defendant's question did not constitute a violation of the collateral source rule.

■ Turning to the question of insurance, we recognize that its mere mention is not *per se* grounds for a mistrial. (*Mondelli v. Checker Taxi Co.* (1990), 197 Ill. App. 3d 258, 554 N.E.2d 266; *Nolan v. Elliott* (1989), 179 Ill. App. 3d 1077, 535 N.E.2d 1053.) Further, a mistrial is not warranted where the subject of insurance is introduced by an isolated inadvertent reference by someone other than plaintiff's counsel with no apparent intent to cause prejudice. (*Mondelli*, 197 Ill. App. 3d 258, 554 N.E.2d 266.) The defendant's expert, Dr. Shenker, mentioned Aetna Insurance as a means of identifying the medical records that he reviewed. Nothing in the record indicates that this reference was intentional or aimed at swaying the jury in favor of the defendants. Moreover, this isolated remark does not rise to the level of reversible error.

The plaintiff further argues that the trial court erred in giving IPI Civil 3d No. 5.01. (Illinois Pattern Jury Instructions, Civil, No. 5.01 (3d ed. 1989) (hereinafter IPI Civil 3d No. 5.01).) The plaintiff acknowledges that he withdrew Dr. Barry Lake Fischer as an expert one week before trial. However, he argues that Dr. Fischer's testimony merely would have been cumulative and, as such, the jury should not have received IPI Civil 3d No. 5.01.

■ "The decision to instruct the jury as to the adverse inference of missing witnesses is within the sound discretion of the trial court." (*Simmons v. University of Chicago Hospitals & Clinics* (1994), 162 Ill. 2d 1, 7, 642 N.E.2d 107, 110.) It is not evident from the record that Dr. Fischer's testimony would have been cumulative. Rather, the opposite conclusion is more readily discernable. Dr. Shenker testified concerning his review of Dr. Fischer's conclusions. Dr. Fischer's deposition testimony indicates that he would not restrict plaintiff's work-related activities except to prohibit climbing. Given this potentially damaging testimony, we cannot say that the trial court abused its discretion in giving IPI Civil 3d No. 5.01.

The plaintiff's final contention is that he was denied a fair trial because the trial court showed considerable prejudice to the plaintiff's counsel throughout the trial. We have reviewed the entire trial transcript, focusing on the sections highlighted by the plaintiff as evidencing the trial court's prejudice against his trial counsel. We have found that the plaintiff has taken many of the allegedly prejudicial remarks out of context.

■ Moreover, the record does not show that the trial court acted with prejudice in dealing with the plaintiff's counsel. We note that the trial court must be given considerable latitude when conducting a trial. (*Oko v. Rogers* (1984), 125 Ill. App. 3d 720, 466 N.E.2d 658.) The majority of the remarks highlighted by the plaintiff were not made in the presence of the jury. Furthermore, the court ruled on objections fairly, without favoring one party over another. We conclude that the entirety of the record shows that the plaintiff received a fair trial.

Finally, we address Kelley's third-party appeal. Kelley contends that the trial court erroneously relied on the Illinois Supreme Court's decision in *Hernon v. E.W. Corrigan Construction Co.* (1992), 149 Ill. 2d 190, 595 N.E.2d 561, when it determined that section 13—214 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 13—214) barred its claim seeking contribution against Jones as untimely. Kelley concedes that it filed its third-party action more than four years after the filing of the underlying complaint. Kelley argues, however, that the limitations period under section 13—204 controls because *Hernon* constitutes a new rule that should not apply retroactively to this case.

This court recently held that *Hernon* does not constitute a new rule, but rather it merely clarifies any doubt that may have existed concerning the application of two different limitation periods, both of which were law at the time *Hernon* was decided. *Garrett v. Lawyers Inc.* (1995), 273 Ill. App. 3d 545, 653 N.E.2d 48.

■ The same is true in the present case. Here, section 13—214 and section 13—204 were both in effect at the time of *Hernon* and at the inception of the underlying lawsuit. A contribution action must be filed during the pendency of the underlying action and within the statute of limitations period applicable to that action. (*La Salle National Bank v. Edward M. Cohon & Associates, Ltd.* (1988), 177 Ill. App. 3d 464, 532 N.E.2d 314.) Therefore, we conclude that the trial court properly dismissed Kelley's complaint for contribution as

untimely because it was filed more than four years after the inception of the underlying lawsuit.

Affirmed.

CAHILL and S. O'BRIEN, JJ., concur.