SIXTH DIVISION

MARCH 31, 1999

No. 1-97-3792

JOHN H. LANG, ) APPEAL FROM THE

) CIRCUIT COURT

Plaintiff-Appellant ) OF COOK COUNTY.

)

v. )

)

LAKE SHORE EXHIBITS, INC., and )

LARRY ZUKER, ) HONORABLE

) JAMES J. HEYDA,

Defendants-Appellees. ) JUDGE PRESIDING.

PRESIDING JUSTICE CAMPBELL delivered the opinion of the court:

Plaintiff, John H. Lang (Lang), brought an action in negligence against defen­dants, Lake Shore Exhibits, Inc. and Larry Zuker, for injuries Lang sustained in an automobile accident with Zuker.
(footnote: 1)  The jury returned a verdict in favor of Lang, and against Zuker, and awarded Lang $20,000.  On appeal, Lang contends that:  (1) the trial court erred in allowing evidence of collateral source payments of income in the form of disability payments by his employer; (2) the jury improperly ignored proven elements of damage in returning its verdict; and (3) the jury's verdict is against the manifest weight of the evidence.  For the following reasons, we reverse and remand this matter to the circuit court for a new trial.

I.  TRIAL

LANG'S INJURIES

The record reveals the following relevant facts.  On August 29, 1992, Lang, a Chicago Police Officer, was on duty driving a police squad car when he was involved in an automobile accident with Zuker.  Zuker's car collided with Lang's squad car, striking the right rear quarter panel.  At trial, Lang testified that his squad car entered the intersection on a green light which changed to yellow when he reached the crosswalk, and Zuker testified that his car entered the intersection on a green light.  There were no eye witnesses to the accident.  After the collision, Zuker's vehicle came to a complete stop, while the squad car moved further down the street before finally stopping.  Lang testified that after the squad car came to a stop, he tried to get out of the squad car, but was unable to do so. Lang was removed from the squad car by paramedics or ambu­lance personnel. 

Lang was admitted to Swedish Covenant Hospital, complaining of pain in his neck and lower back.  The evidence revealed that Lang had injured his back in two prior automobile accidents in 1985 and 1986.  On both prior occasions, Lang was treated by Dr. Geline and took medical leave from work for two months and four months, respec­tively.  Lang testified that the pain he experienced following the 1992 accident at issue in this case differed from the pain he experienced following the two prior accidents, in that after the prior accidents, Lang did not experience pain receding and radiating down his legs.  X-rays taken of Lang's Lumber spine after the accident showed only Lang's prior condition of spondylolysis at L5 and spondylolisthesis at L5-S1.   

After three days of hospitalization, Lang was discharged and referred to Dr. Whisler of Illinois Masonic Hospital by the Chicago Police Department medical section for follow-up treatment.  Lang complained to Dr. Whisler of back pain and pain in both legs, and Dr. Whisler prescribed pain relievers.  Lang received treatment from Dr. Whisler for ten weeks, during which time he did not return to work.  On October 16, 1992, Lang underwent an MRI examination.  Lang's MRI confirmed the findings of his prior X-rays, which showed only Lang's pre-existing conditions.  Lang subsequently underwent two weeks of physical therapy.  After three months, Dr. Whisler released Lang from his care, and told Lang he could return to work on a light-duty basis.

Between December 1992, and April 1993, Lang did not receive any medical care or treatment.  In April 1993, Lang was treated by Dr. D'Silva for  lower back pain and radiating pain in his legs.  Dr. D'Silva referred Lang to Dr. Giri Gireesan, an orthope­dic surgeon.  Dr.  Gireesan diagnosed an aggravation of Lang's pre-existing condition, and recommended surgery as an option to alleviate his continued pain.

On August 2, 1993, Lang underwent a laminectomy and fusion on his spine.  During surgery, doctors discovered that Lang had spondylolysis, a fracture at L4, a condition that was never seen on any prior x-rays or MRI films.  Both Dr. Gireesan and Dr. David L. Spencer testified that Lang suffered this new fracture some time between October 16, 1992 (the date of the MRI), and the date of Lang's surgery.

Dr. Gireesan testified that Lang's surgery was successful.  After six months of post-operative physical therapy, Dr. Gireesan released Lang from his care on Septem­

ber 20, 1994.  Dr. Gireesan told Lang that he could not expect to do excessive work, and that he needed to "baby" his spine.  At that time, Dr. Gireesan gave Lang a prescription for pain killers, and Lang did not receive another prescription until Novem­ber 1995.

Lang testified due to severe back pain  since the accident, he has been able to perform daily living activities, but is unable to do any running, lifting or any activity involving prolonged sitting, like long-distance driving.

Lang submitted medical bills totalling $76,593.64,

DISABILITY AND LOSS OF EARNINGS

Lang was ordered off work until November 1992.  When Lang returned to work, he was assigned to light duty status.  After two weeks, Lang voluntarily took furlough time, and did not work for four and one-half weeks.  During that time, however, Lang did not seek further medical treatment.  Lang returned to work full time until April 1993, when he was treated by Dr. D'Silva.  Lang continued to work until shortly before his surgery in August 1993.

Dr. Gireesan testified that when he was ready to release Lang from his care,  he asked Lang if light duty work was available for him .  Lang told Dr. Gireesan that no light duty work was available.  Based upon this information, Dr. Gireesan conclud­ed that Lang was unable to return to work as a police officer, and the Chicago Police Depart­ment (Department) granted Lang's request for a leave of absence.

Barb Hemmerling, the medical administrator of the Department's medical services section, testified that Lang could have returned to active duty in the Depart­ment at any time after September 1994,  as there existed plenty of limited duty assignments.  Lang, however, requested to return to work in some capacity other than police work, and he was refused.  Hemmerling testified that the Department did not offer retraining to police officers.

In 1995, Jean Blake, also of the Department medical services section, recom­

mended to the Police Retirement Board that Lang be granted a leave of absence and disability, and the Board approved his leave.

Lang testified that he moved his family to Colorado in 1995 for the improved climate.  Lang stated that he does tasks around the house and tries to engage in activities with his children.  However, he can only play ball with his son for 10 to 15 minutes.  

Lang stated that at the time of the accident, he and his wife operated an electrical contracting business with a partner, and that Lang worked in the business as an elec­trician for 20 to 30 hours per week in addition to working as a police officer.  After the surgery, Lang did estimates and billing for the business.  Lang was not allowed by the Department to do the physical work of an electrician.

Lang testified that he tried to find work in Colorado as an electrician, and that he applied at the union hall for supervisory or estimator positions.  Lang also applied for a job as a meter reader.  At the time of his applications, Lang told prospective employers about his qualifications and his medical problems.  At the time of trial, Lang was earning $3,527 per month.

Zuker produced surveillance tapes during trial showing Lang in and around his home in Colorado, lifting large pieces of plywood onto and off of a flatbed trailer.  The tapes also showed Lang hitching and unhitching the trailer to his vehicle, and doing a substantial amount of work in his garage.

Following trial, the jury returned a verdict in favor of Lang and against Zuker in the total amount of $20,000, reflecting a reduction by 49% for contributory fault assessed against Lang.  The damages included $15,000 for pain and suffering and $5,000 for medical expenses.  The jury made no award for loss of normal life, future pain and suffering, future medical expenses, or past or future lost earnings.

The trial court entered judgment on the verdict on May 30, 1997, and denied Lang's post-trial motion on September 10, 1997.  Lang's timely notice of appeal fol

lowed.

II.  OPINION

On appeal, Lang contends that the trial court erred in allowing evidence of collateral source payments of income in the form of disability payments by the Chicago Police Department.

The record shows that prior to trial, Lang moved in 
limine
 to bar any evidence of collateral source payments at trial.  Zuker objected.  The trial court acknowledged that the collateral source rule applied in this case, but stated that Zuker would be allowed to put in evidence of collateral source payments in his 
case-in-chief 
 if he could affirma­tive­ly show that Lang may be malingering.  

On direct examination, Lang testified that he was physically unable to work as a police officer, or in any other job since the date of his surgery.  Zuker represented that he would be able to present evidence that Lang could have returned to work through the testimony of the Chicago Police Department Medical Administrator, Barb Hemmerling.

However, rather then following the order of the trial court and presenting evidence of Lang's alleged malingering in his 
case-in-chief
, defendant embarked on the following course of inquiry during cross-examination of Lang:

"Q: Excuse me. In the application in front of you, you put down your reasons for withdrawing from the union, did you not?

* * *

A: Yes sir.

* * *

Q: And you gave them your reasons for with­drawing from the union in Paragraph 7 of that exhibit, isn't that right?

A: Yes.

Q: You filled this out, you signed it, right?

A: Yes sir. 

Q: And the reason you gave for withdrawing from the union is, quote, I am on disability with the Chicago Police Department because of a back injury on duty.  I had an operation on my back to fuse my spine and am unable to work in the electrical field because I am draw­ing on disability work comp [sic] payments from the police depart­ment."

A sidebar commenced after plaintiff's objection to the above line of questioning.  At that time, Zuker's counsel admitted that he had no doctor or expert witness who would testify that plaintiff was malingering. Zuker argued, however, that the follow­ing evidence revealed Lang's motivation not to work:  (1) Lang's application for withdrawal form the electrician's union; (2) Lang's deposition testimony in which he admitted not returning to work for fear of losing his disability compensation; (3) testimony of witnesses stating that Lang is able to work; and (4) videotaped surveil­lance showing Lang engaged in activities despite his disability.  The trial court ruled that Zuker had sufficient evidence to allow Zuker to inquire into Lang's disability payments and argue that Lang was motivated not to return to work.  

In support, the trial court relied on cases outside of the Illinois jurisdiction cited in 47 A. L. R. 3d 234.  Included in the A. L. R. are citations to decisions which hold that a tortfeasor may not introduce evidence that the tort victim received payments of medical expenses or disability benefits from a collateral source unless there was other evidence establishing malingering. 
 
See, 
e.g.
, 
Burke Enterprises, Inc. v. Mitchell, 
700 S.W.2d 789 (1985), Prod Liab. Rep. (CCH) para. 10780 (Ky 1985); 
Ridilla v. Kerns, 
155 A.2d 517 (Mun. Ct. App. D. C. 1959); 
Lewis v. Fidelity & Casualty Co., 
230 So. 2d 636 (La App. 1970); 
Wentworth v. Butler, 
134 Minn 382, 159 NW 828 (1916); 
Perry v. Public Service Coordinated Transport, 
136 N.J.L. 398, 56 A.2d 617 (1948).  The trial court read a special instruction to the jury to explain that the evidence of receipt of disability payments was to be used "solely on the issue as to whether plaintiff is motivated to extend his period of disability." and not to reduce Lang's compensable damages.  The trial court read the instruction to the jury again prior to its deliberations.

The A.L.R. provides in pertinent part as follows:

"[M]ost courts have recognized that, insofar as it tends to establish a motivation for inactivity unrelated to physical incapacity, evidence of a personal injury plaintiff's receipt of collateral source benefits during the period of this alleged disability is relevant to the basic issue of the extent of his injuries.  For a variety of reasons, however, it is usually acknowl­edged that the trial judge should exclude such evi­

dence, or admit it only warily. Chief among theses reasons is the possible prejudice to the plaintiff which attends informing the jury that he has already received some form of compensa­

tion for the injuries complained of." 47 A.L.R. 238, § 2(a).  

The A.L.R. notes that in many jurisdictions (
e.g
., California, Kentucky, Oregon, Texas, Vermont)  collateral source benefits can 
only
 be admitted by the trial judge if other evidence in the case (
i.e.
, the nature of the plaintiff's injuries, length of his absence from work, extent of lost wages) indicates that plaintiff was motivated by the collateral source receipts in remaining inactive:  "where the bare fact of the plaintiff's receipt of such collateral benefits constitutes the sole indicia of malingering, evidence thereof should be properly excluded."  47 A.L.R. 249.  The A.L.R. advises that there are a variety of other methods by which malingering can be established, including expert and not-expert witnesses and "secret motion pictures" taken of the plaintiff revealing activity inconsis­tent with his claim of disability.  47 A.L.R. 243.

In Illinois, it is well established that evidence of benefits received by a plaintiff from collateral sources independent of the tortfeasor will not serve to diminish any damages otherwise recoverable. 
Natalino v. JMB Realty Corp., 
277 Ill. App. 3d 270, 660 N.E.2d 138 (1995), 
Brumley v. Federal Barge Lines, Inc. 
78 Ill. App. 3d 799, 396 N.E.2d 1333 (1979); 
Boden v. Crawford, 
196 Ill. App. 3d 71, 552 N.E.2d 1287 (1990).  The theory behind this rule is to keep the jury from learning anything about collateral income which could influence the decision of the jury: "[a]llowance of any evidence regarding the benefits would render this long standing rule meaningless." 
Boden, 
196 Ill. App. 3d at 76.

Illinois courts have not addressed an exception to the collateral source rule for motivation or malingering in a case with facts comparable to the present case.  To this extent, this case presents a question of first impression.  However, 
Brumley, 
a case decided under the federal Jones Act, is instructive. There, this court held that under federal law (
Tipton v. Socony Mobil Oil Co., 
375 U.S. 34, 11 L.Ed.2d 4, 84 S.Ct. 1 (1963) and 
Eichel v. New York Central R. R. Co.,  
375 U.S. 253, 11 L.Ed.2d 307, 84 S.Ct. 316 (1963)), evidence of benefits from collateral sources was inadmissible to show motivation:

"In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence.  Insofar as the evi­dence bears on the issue of malingering there will generally be other evidence having more probative value and involv­ing less likelihood of prejudice than the receipt of a dis­ability pen­

sion."  
Brumley,  
78 Ill. App. 3d at 897 (quoting 
Tipton, 
375 U.S. at 255).

The 
Brumley 
court further noted:

"Even if the collateral source doctrine were a question of state law as argued by defendant, we believe the result would be the same.  The issue of the admissibility of social security, retire

ment and pension benefits, for the limited purpose of showing Brumley's motivation to retire from work would be one of first impression in this state.  While defendant is cor­rect in noting that several courts in other jurisdictions have allowed evidence of payments from a third party in non-Jones Act cases when relevant to the question of a plaintiffs motiva­tion to continue working and the nature and extent of his injuries [citations omitted] we believe that our supreme court would adhere to the federal rule set forth in 
Tipton 
and 
Eichel 
in Jones Act cases."  
Brumley, 
78 Ill. App. 3d at 808.

In the present case, in addition to the collateral source payments, Zuker presented videotapes of Lang taking out the garbage, loading an unloading his flatbed trailer with drywall and wood, and hitching and unhitching Lang's trailer to his Cadillac, without exhibiting signs of disability.  In addition, Zuker presented testi­mony of physicians who stated that Lang was physically able to return to work at the Department for light duty, as well as the testimony of Barb Hemmerling who stated that Lang could have returned to police work at less than full duty given certain restrictions.  Thus, Zuker had enough evidence to show the possibility of malingering on Lang's part without the improper introduction of collateral source evidence.

In addition, the limiting instruction given to the jury that evidence of the receipt of disability payments was to be used "solely on the issue as to whether plaintiff is motivat­ed to extend his period of disability," and not to reduce Lang's compensable damages, is misleading.  The jury award form includes a category of "loss of normal life resulting from the injury," which is commonly understood to mean compensable damages for disability.

Under the specific facts and circumstances of this case,  we find that the trial court erred in allowing evidence of payments from a collateral source and therefore denied Lang a fair trial.  As such,  we vacate the judgment entered and remand this matter for a new trial.  In light of our determination, we need not address the remaining issues raised by Lang on appeal.

Vacated and remanded.

BUCKLEY, J., and ZWICK, J., concur.

FOOTNOTES
1:     
Lake Shore Exhibits, Inc. was dismissed from the case prior to trial.